**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ANN W. HUMPHREY, individually and }
on behalf of all others similarly situated, }
        Plaintiff, }
v. }            CIVIL  ACTION  NO.  H-05-0758
 }
UNITED WAY OF THE TEXAS GULF }
COAST, a Texas non-profit corporation, }
and UNITED WAY OF THE TEXAS }
GULF COAST CASH BALANCE PLAN }
        Defendants. }

<u>**MEMORANDUM OPINION AND ORDER CERTIFYING HUMPHREY CLASS**</u>

Pending before the court in this ERISA[1] case is Plaintiff Ann W. Humphrey's ("Humphrey's") motion for class certification (Doc. 44). Defendants have filed a response in opposition (Doc. 62), and Humphrey has replied (Doc. 64). Defendants also filed a sur-reply (Doc. 67). The court held a hearing on April 26, 2007, and, subsequently, Humphrey filed a supplemental memorandum in support of certification (Doc. 84), to which Defendants responded (Doc. 86). Because the proposed class is a sufficiently numerous, cohesive group that is adequately represented by Plaintiff and her counsel and because the class is predominately seeking declaratory relief that the Defendants misinterpreted the plain language of the plan, the court ORDERS that Humphrey's motion for class certification is GRANTED.

**I.**        **BACKGROUND & RELEVANT FACTS**[2]

    (A)    <u>The United Way of the Texas Gulf Coast Cash Balance Plan</u>

---

[1] Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001 *et seq.*

[2] These facts are drawn from Plaintiff's and Defendants' cross motions for summary judgement and the exhibits attached thereto. The court is not, however, deciding the merits of these motions. *See Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 306 (5th Cir. 2007) (stating that a district court must rigorously evaluate the facts and substantive law in resolving class certification issues, but must not "assess the merits of the case").

Until 1996, Defendant United Way of the Texas Gulf Coast ("United Way") sponsored Defendant United Way of the Texas Gulf Coast Cash Balance Plan ("the plan") as a traditional defined benefits pension plan ("89 Plan" or "prior plan").  A defined benefits pension plan calculates its participant's pension by multiplying a percentage of the participant's pay by his years of service.  One valuable benefit participants received under the 89 Plan was the Early Retirement Pension ("ERP").[3]  This provision allowed qualified participants age 55 or older to collect their pensions free of actuarial reduction.  A participant could, in other words, retire up to ten years early and still receive full benefits.

During the mid 1990's, United Way grew concerned about its ability to fund its pension obligations.  Based on the recommendation of its actuaries, it chose to switch to a Cash Balance Plan ("96 Plan" or "new plan").  The 96 Plan differed substantially from the 89 Plan.  Under the new plan, participants were given a hypothetical account to which United Way could contribute credits. Two types of credits were available: contribution credits, which are a percentage of a participant's salary, and interest credits, which are the interest earned on the participant's account balance.  For participants in the prior plan, the 96 Plan provided that their accrued benefits would

---

[3] Section 5.3 of the 89 Plan provides, in relevant part, as follows:

<u>Early Retirement Pension</u>: Any Participant who retires after satisfying the requirements for early retirement set forth in Section 4.3 shall be entitled to receive an Early Retirement Pension commencing on his Annuity Starting Date in a monthly amount equal to one-twelfth (1/12) of the sum of (a) plus (b), where (a) is an amount equal to one and twenty-five hundredths percent (1.25%) of his Pension Compensation Base multiplied by the years of Credited Service actually earned by the Participant at his Early Retirement Date and (b) is fifty-four hundredths of one percent (.54%) of his Pension Compensation Base in excess of the Maximum Social Security Wage Based, multiplied by the Participant's total years of Credited Service which would have been earned at Normal Retirement Date, not to exceed thirty-five (35) years.  The amount computed under Section 5.3(b) is multiplied by the Accrued Benefit Fraction and then reduced by one-one hundred eightieth (1/180) thereof for each of the first sixty (60) months and one-three hundred and sixtieth (1/360) thereof for each of the next sixty (60) months by which the commencement of his pension precedes his Normal Retirement Date.  If the starting date of the pension precedes his Normal Retirement Date by more than one hundred twenty (120) months, the amount of the pension will be an amount which is the Actuarial Equivalent of the pension payable one hundred twenty (120) months preceding his Normal Retirement Date.

(89 Plan § 5.3, Pl.'s Ex. 1, Doc.  42.)

become the opening balances in their accounts.

Like the 89 Plan, the 96 Plan allowed qualified participants to take early retirement. The original version of the 96 Plan, executed December 15, 1995, provides that participants electing early retirement will collect an Early Retirement Pension consisting of what they would have been entitled to under the 89 Plan *plus* what they are entitled to under the 96 Plan.[4]

On April 2, 1997, this language was amended in part to provide as follows:

Early Retirement Pension: Any Participant [who] retires after satisfying the requirements for early retirement set forth in Section 5.3 shall be entitled to receive an Early Retirement Pension commencing on his Annuity Starting Date.  The Early Retirement Pension shall be equal to the ***greatest of*** (a), (b), or (c), where (a) is equal to the value of the Participant's Account Balance, (b) is equal to the value of the Participant's Prior Plan Account converted to an annuity on the basis of the actuarial factors specified in the Prior Plan, and (c) is equal to the Actuarial Equivalent of the Participant's Accrued Benefit under this Plan, increased until his Normal

---

[4]  Section 6.5 of the 96 Plan provides, in its entirety, as follows:

Early Retirement Pension: Any participant who retires after satisfying the requirements for early retirement set forth in Section 5.3 shall be entitled to receive an Early Retirement Pension commencing on his Annuity Starting Date.  The Early Retirement Pension shall be equal to (1) ***plus*** (2), where (1) is equal to (a) reduced by (b), and (a) is the Normal Retirement Pension based on the Participant's Prior Plan Account earned under the Prior Plan, and (b) is one-one hundred eightieth (1/180) thereof for each of the first sixty (60) months and one-three hundred sixtieth (1/360) thereof for each of the next sixty (60) months by which the commencement of his pension precedes his Normal Retirement Date; and (2) is the Actuarial Equivalent of the Normal Retirement Pension based on the Participants Accrued benefit earned under this plan from and after January 1, 1996, increased until his Normal Retirement Age by an amount equal to (i) the actual Interest Credit in effect for the period between his termination of Service and his Annuity Starting Date and (ii) the Interest Credit in effect at his Annuity Starting Date and his attainment of Normal Retirement Age (the "Estimated Pension").  If the starting date of the pension precedes his Normal Retirement Date by more than one hundred twenty (120) months, the amount of Early Retirement Pension will be an amount which is the Actuarial Equivalent of the Estimated Pension payable one hundred twenty (120) months preceding his Normal Retirement Date.

Notwithstanding any provision of the Plan to the contrary, any Participant who retires on or after the Effective Date [defined as 1/1/96] shall be entitled to an Early Retirement Pension equal to at least the Pension amount derived from the formula in effect under the Prior Plan on December 31, 1995 [sic] for all years of Credited Service (as defined in the Prior Plan) prior thereto ***plus*** the pension earned under this Plan.

The Early Retirement Pension is payable on a five-year certain and for life annuity basis, except as may be provided in Section 6.8.

(96 Plan § 6.5, Pl.'s Ex. 2, Doc. 42 (emphasis added).)

Retirement Age by an amount equal to (i) the actual Interest Credit, for the period between his termination of Service and his Annuity Starting Date; and (ii) the Interest Credit in effect at the time of his Annuity Starting Date, for the period between his Annuity Starting Date and his attainment of Normal Retirement Age.

(1st Am. to 96 Plan, Pl.'s Ex. 7, Doc. 45 (emphasis added).)   The industry describes this as  a "wear-away" provision, which prevents a participant from acquiring new benefits for a period of years after the plan is changed.[5]

Despite the change in this first paragraph, the second paragraph of the plan remained the same, continuing to guarantee every plan participant who elected to receive an Early Retirement Pension "at least the Pension amount derived from the formula in effect under the Prior Plan on December 31, 1995 for all years of Credited Service (as defined in the Prior Plan) prior thereto ***plus*** the pension earned under this Plan."[6]   The "plus" language in the second paragraph remained in effect until 2002, when the 96 Plan was amended for the last time.   The Plan now provides:

<u>Early Retirement Pension</u>: Any Participant who retires after

---

[5] In other words, a participant will not accrue any new benefits until he has "worn away" his benefits under the old plan.

[6] Section 6.5 of the 96 Plan, including the April 2nd amendment, provides in its entirety as follows:

<u>Early Retirement Pension</u>: Any Participant [who] retires after satisfying the requirements for early retirement set form in Section 5.3 shall be entitled to receive an Early Retirement Pension commencing on his Annuity Starting Date.   The Early Retirement Pension shall be equal to the ***greatest of*** (a), (b), or (c), where (a) is equal to the value of the Participant's Account Balance, (b) is equal to the value of the Participant's Prior Plan Account converted to an annuity on the basis of the actuarial factors specified in the Prior Plan, and (c) is equal to the Actuarial Equivalent of the Participant's Accrued Benefit under this Plan, increased until his Normal Retirement Age by an amount equal to (i) the actual Interest Credit, for the period between his termination of Service and his Annuity Starting Date; and (ii) the Interest Credit in effect at the time of his Annuity Starting Date, for the period between his Annuity Starting Date and his attainment of Normal Retirement Age.
<u>Notwithstanding any provision of the Plan to the contrary</u>, any Participant who retires on or after the Effective Date shall be entitled to an Early Retirement Pension equal to at least the Pension amount derived from the formula in effect under the Prior Plan on December 31, 1995 [sic] for all years of Credited Service (as defined in the Prior Plan) prior thereto ***plus*** the pension earned under this Plan.

The Early Retirement Pension is payable on a five-year certain and for life annuity basis, except as may be provided in Section 6.8.

(96 Plan Incorporating 1st Am. to 96 Plan, Pl.'s Ex. 12, Doc. 46 (emphasis added).)

satisfying the requirements for early retirement set forth in Section 5.3 shall be entitled to receive an Early Retirement Pension commencing on his Annuity Starting Date.  The Early Retirement Pension shall be equal to the **greater of** (a) or (b), where (a) is equal to the Actuarial Equivalent of the Participant's Account Balance, and (b) is equal to the Prior Plan Accrued Benefit with reduction for early commencement in accordance with the provisions of the Prior Plan.

Notwithstanding any provision to the contrary, any participant who retires on or after the Effective Date and elects to receive his benefit as a single lump sum, such lump sum shall not be less than the Actuarial Equivalent of the Prior Plan Accrued Benefit.

(02 Plan § 6.5, Pl.'s Ex. 4, Doc. 43(emphasis added).)

United Way did not provide notice to the plan beneficiaries of the 2002 amendments, which stripped them of the benefits due under the 96 Plan.

    (B)    <u>Ann W. Humphrey</u>

Plaintiff Ann W. Humphrey ("Humphrey") is the beneficiary of the pension benefits of Fredrick B. Blackmer ("Blackmer"), deceased.  Before his retirement, Blackmer worked at the Center for the Retarded, Inc. ("CRI"), a participant in United Way's Cash Balance Plan.  After more than 25 years of service, Blackmer elected early retirement at age 63.  In January 2004, he received a lump sum distribution of $40,700.25 directly into his IRA account.

Before his retirement, Blackmer had already disputed the amount of his pension and exhausted his administrative remedies.  (*See* Blackmer Letters, Pl.'s Exs. 33, 35-38, Doc. 49.) At the administrative level, the dispute centered on two issues.  First, how to calculate Blackmer's opening balance based on his participation in the 89 Plan; and second, whether interest earned on his opening balance should be included.  The dispute did not, in the beginning, involve whether the benefits under the 89 Plan should be added to the benefits under the 96 Plan; the plan never disputed that Blackmer's ERP should be calculated by adding the amount of his pension under the prior plan to the amount of his pension under the new plan.  The plan found that under the 89 Plan, Blackmer's

opening balance should be calculated as the present value, on December 31, 1995, of a $302.82 per month, lifetime annuity payable at normal retirement age, sixty-five. (*See* Pl.'s Ex. 35, Doc. 49.) It also found that interest earned on this sum should be counted towards pension earned under the prior plan and not the 96 Plan. (*Id*.) Blackmer disagreed with both of these conclusions. He claimed that under the new plan his opening balance should be calculated as the present value, on December 31, 1995, of a $302.82 lifetime annuity payable immediately, and that interest paid on that sum should be credited towards his pension under the new plan. The plan affirmed its decision despite Blackmer's arguments.

On appeal, the plan asserted for the first time that the "greater of" methodology, rather than the "plus" methodology, was the proper calculation. It claimed, further, that the benefits already distributed represented this "greater of" amount. Lee James ("James"), the actuary who participated in the administrative decision on Blackmer's claim, and Debra King ("King"), United Way's Vice-President of Finance, both testified that the plan had always calculated the ERP as the "greater of" the pension earned under the 89Plan or the 96Plan, not the "sum of" these two pensions. (James Dep. 37-39, Dec. 7, 2005, and King Dep. 29-30, Dec. 20, 2005, Pl.'s Exs. 58 & 60, Docs. 51 & 52.) Indeed, United Way maintains that the "plus" language in the 96 Plan was a "scrivener's error," and that the "greater of" methodology had always been the intended and correct calculation under the 96 Plan.

(C)   The Motion for Class Certification

Humphrey filed suit on March 9, 2005, seeking an order enforcing the "plus" methodology, granting the appropriate payment of benefits under the 96 Plan, and finding that Defendants violated ERISA § 204 when they amended the 96 Plan in 2002 without sending notice to the plan's beneficiaries. She also moves to certify a class of similarly situated participants and

beneficiaries.   Plaintiff proposes that the class be defined as follows:

> All Participants or Former Participants (as those terms are defined in
> the Plan), and beneficiaries of such Participants or Former
> Participants, who (1) as of 12/31/95, had accrued a pension under the
> Prior Plan (as defined in the Plan), (2) were or hereafter are eligible
> for an Early Retirement Pension under the Plan ("ERP"), and (3)
> either received an ERP or are eligible to receive an ERP or hereafter
> become eligible to receive an ERP.

(Pl.'s Mot. Class Cert. 2, Doc. 44.)  The class would, therefore, generally include participants, or

beneficiaries thereof, whose pension benefits vested when United Way switched to the 96 Plan.

Defendants oppose class certification.

## II.        LEGAL STANDARD

Under Federal Rule of Civil Procedure 23(c)(1)(A) and (B), the court must

"determine by order whether to certify the action as a class action" and, if it determines that it should

do so, "define the class and the class claims, issues, or defenses" in the order certifying the class.

The court has wide discretion in determining whether to certify a class, but that discretion must be

exercised within the bounds of Rule 23.  *Henry v. Cash Today, Inc.*, 199 F.R.D. 566, 570 (S.D. Tex.

2000), *citing Castano v. American Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996).  The district

court's decision to certify a class will only be reversed for abuse of discretion or application of

incorrect legal standards.  *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999).


In the process of determining whether a class should be certified, the court is required

to conduct a rigorous analysis of Federal Rule of Civil Procedure 23's prerequisites.  *General

Telephone Co. v. Falcon*, 457 U.S. 147, 161 (1982); *Castano*, 84 F.3d at 740.  While class

certification hearings should not be mini-trials on the merits,  the court must go beyond the pleadings

and examine the evidence to understand the claims, defenses, and relevant facts to make a

meaningful certification decision. *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005) ("The

plain text of Rule 23 requires the court to 'find,' not merely assume, the facts favoring class certification."), *citing Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974).  In addition, the court, though not reaching the merits, must consider how plaintiffs' claims will be tried, individually or on a class basis.  *Castano*, 84 F.3d at 744.

The text of Rule 23 provides the guidelines for class certification.  Rule 23(a), setting forth part of the "Prerequisites to a Class Action," provides,

> One or more members of a class may sue or be sued as class representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  If the prerequisites are met, the next issue is whether certification is appropriate under Rule 23(b).  Rule 23(b) authorizes certification,

> if the prerequisites of subdivision (a) are satisfied, and in addition
>
> (1) the prosecution of separate actions by or against individual members of the class would create a risk of
> (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct of the party opposing the class, or
> (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests . . . .
>
> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunction relief or corresponding declaratory relief with respect to the class as a whole; or
>
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  The matters pertinent to the findings include:  (A) the interest of members of the class in individually controlling the

prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of  a class action.

As the movant for class certification here, Humphrey bears the burden of demonstrating that a class action is appropriate and that all requirements of Rule 23 are satisfied. *See Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001), *clarified*, 279 F.3d  313 (5th Cir. 2002).   For the reasons that follow, the court finds that Plaintiff has satisfied all the requirements of Rule 23 and that class certification is appropriate.

## III.        ANALYSIS

### (A)     Rule 23(a) Factors Analysis

#### 1.     Numerosity

A finding of numerosity turns not on mechanical rules but on whether joining all class members individually is practical.  *Watson v.  Shell Oil, Co.*, 979 F.2d 1014, 1022 (5th Cir. 1992).  Generally, a class size of more than forty members satisfies the numerosity requirement. *See* 1 Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 3.5 (4th ed. 2002).  In establishing class size, a plaintiff may reasonably estimate the number of people in the purported class.  *James v. City of Dallas*, 254 F.3d 551, 570 (5th Cir. 2001).  Here, the court finds that Humphrey has satisfied her burden of showing that numerosity exists.  The class size, estimated conservatively at 60 members, makes joinder impractical.  Humphrey bases her estimate on United Way's tax forms showing, *inter alia*, the number of active participants, the average annual earnings, ERP-eligible participants, and retirement rates.  (*See* Pl.'s Exs. 66-69 and 71-72, Docs. 53-55, 59.)  She also considered United Way's admission that it had always used the "greater of"calculation for ERP benefits.  Applying the lowest average retirement rate to the number of ERP-eligible participants

with earnings commiserate with Blackmer's, Humphrey estimates that an average of six participants a year would qualify as class members.  Because the 96 Plan has been in effect for over ten years, the number of potential class members would be approximately 60.  The court finds that Plaintiff's methodology for estimating the class size is reasonable and that putative class is sufficiently numerous to satisfy the first prong of the Rule 23(a) analysis.

2.      Commonality

Commonality and typicality are not demanding tests.  *Henry*, 199 F.R.D. at 569 (citing *Lightbourn v. County of El Paso, Texas*, 118 F.3d 421, 426 (5th Cir. 1997)).  Commonality requires that the resolution of at least one issue will affect all or substantially all of the class. *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir. 1993).  This test is easily satisfied here because the central legal issue affecting all members is whether the "plus" or "greater of" language in the 96 Plan controls.  Thus,  Plaintiff has satisfied her burden on the issue of commonality by demonstrating that there is a question of law common to the class.  *See* Fed.  R.  Civ.  P.  23(a)(2).

3.      Typicality

Typicality requires similarity between plaintiffs' legal and remedial theories and those of the class members they want to represent.  *Mullen*, 186 F.3d at 625.  Typicality does not, however, "require a complete identity of claims."  *James v.  City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001).  The critical inquiry is whether the claims arise from a similar course of conduct and share the same essential characteristics of the class.  *Id.*

In this case, each of the claims arises from the same event or course of conduct and each is based on the same legal theory, i.e., that the "plus" methodology of the 96 Plan controls the calculation of early retirement pension benefits.  The plan's interpretation of 96 Plan is a standard course of conduct.  It has always interpreted the 96 Plan as using the "greater of" methodology.  It has never provided notice of the amendments to the 96 Plan.  Instead, it maintains that the "plus"

language was a mistake and that no change in benefits resulted in rectifying that mistake. Humphrey's request for relief, in the form of a declaration that the plan miscalculates the ERP benefits when it uses the "greater of" methodology, is characteristic of and fully aligned with the goals of the class. With respect to monetary relief, the actual dollar amounts may vary, but the calculation to determine benefits owed would be identical. Thus, Humphrey's legal claim regarding the "plus" methodology not only typifies the class but is also the linchpin of the entire case. For these reasons, the court finds that Humphrey satisfies the requirements of typicality under Rule 23(a)(3).

4.      Adequacy

To be an "adequate" representative of the class, Humphrey must show that she, her counsel, and the relationship between the two are adequate to protect the interests of the absent class members. *See* Fed. R. Civ. P. 23(a)(4); *see also Unger*, 401 F.3d at 321. Stated differently, an adequacy determination requires an inquiry into (1) the willingness and ability of the representative to take an active role in and control of the litigation and to protect the interests of the putative class members and (2) the zeal and competence of the representative's counsel. *See Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 129-30 (5th Cir. 2005). The determination also seeks to uncover potential conflicts of interest between the representative and the individual class members. *Id.* at 130. The court finds that Humphrey has met her burden in proving that both she and her counsel will be adequate representatives of the class.

Humphrey is willing and able to take an active role in and appropriate control of the litigation and to protect the interests of the class. First, she has actively participated in the case. Although encouraged by Blackmer and his family, Humphrey independently decided to file suit after Blackmer died:

Q.   Okay.  When he [Beatty[7]] asked you to file it, what did he
     say?
A.   He actually told me–he asked me to do it.  And he goes, "It's
     up to you if you do it or not."  He says, "You don't have to."
     That's what he told me.
Q.   Okay.
A.   And I had decided to do it.

***

Q.   Okay.  And I think that earlier you testified that the only
     reason you filed this lawsuit was because either [Blackmer's]
     family or [Beatty] had asked you to continue?
A.   Yes.
Q.   And was there any other reason why you wanted to file this
     lawsuit?
A.   Because I felt that the other employees that were in the plan
     did not get their money.  So, I felt that I should do–try to help
     them get their money, as well.
Q.   And were you partly motivated by the fact that there's maybe
     some money in it for you, as well?
A.   Yes.

(Humphrey Dep. 98:1-13, 104:10-23, March 9, 2006, Doc. 44 Ex. A.)  Since filing suit, she has

actively monitored the action by having the litigation documents read to her because of her poor

vision from Cerebral Palsy.  She has also helped answer interrogatories and provided pertinent

deposition testimony.  These facts demonstrate that Humphrey is sufficiently participating in the

litigation of her case.

Second, she has exhibited appropriate control of the litigation. While clearly not a

legal scholar, Humphrey has a good faith knowledge and understanding of the issues in this case.

*See Berger*, 257 F.3d at 783 (noting that class representatives "need not be legal scholars and are

entitled to rely on counsel," but they do "need to know more than that they were 'involved in a bad

---

[7] George Beatty ("Beatty") is Blackmer's brother-in-law and also an attorney.  Blackmer requested Beatty's help in arguing his (Blackmer's) administrative claim for the ERP benefits calculated under the "plus" methodology. Beatty is not representing Humphrey in the present suit.

business deal'") (quoting *Kelley v. Mid-America Stables Racing, Inc.*, 139 F.R.D. 405, 410 (W.D.

Okla. 1990)).   She understood who she was suing and why:

> Q. Why are you suing the United Way of the Texas Gulf Coast?
> A. Because in–because in 1996 the United Way changed their pension plan or–pension plan.
> Q. Is this the only reason why you're suing the United Way of the Texas Gulf Coast, because they changed their pension plan in 1996?
> A. Yes.
> Q. What was wrong with their changing their pension plan in 1996?
> A. There was nothing wrong–there was nothing wrong with them changing their plan.  It's just that they did not pay the older employees their–they were promised the old plan with the new plan; and they only was paid the old plan instead of the new plan, too.
>
> ***
>
> Q. Why are you suing the United Way of the Texas Gulf Coast Cash Balance Plan?
> A. Because they did not pay [Blackmer] and the other employees the Cash Balance Plan.
> Q. Who are these other employees that you're talking about?
> A. The class.
> Q. The class?
> A. Uh-huh.
> Q. And when you say "the class", what do you mean by "the class"?
> A. The class of people that did not receive all of their pension.

(Humphrey Dep. 21:2-16, 21:23-22:10, Doc. 44 Ex. A.)   More importantly, Humphrey's

understanding of the facts underlying her case derived primarily from her relationship with

Blackmer, not from derivative knowledge acquired solely from counsel.  *See Berger*, 257 F.3d at

483 n.18.  As such, the court finds that Humphrey has sufficient knowledge and understanding to

appropriately control the litigation efforts.

Finally, Humphrey is more than capable of protecting the interests of the absent class

members.  As the typicality analysis above reflects, Humphrey's incentive to fully litigate her claims

aligns directly with the goals and claims of the putative class. *See Stirman v. Exxon Corp.*, 280 F.3d 554, 563 (5th Cir. 2002) (noting that the typicality requirement overlaps with the adequacy requirement when assessing whether a class representative's interests conflict with those of the putative class). When asked what she wanted to accomplish in this lawsuit, Humphrey responded: "I want to accomplish that [sic] everyone that's involved in the lawsuit, all the people, you know, in the–in the claim of this lawsuit, that they get the other half of their pension . . .I want them to get the B side of this pension." (*Id*. at 99:8-18.[8]) She also understood her role as the class representative:

> Q.   And earlier Ms. Lyons asked you if you thought you had any duty as a class representative, and you said no. So, I want to make sure that you understood what you were being asked. Let me ask you this: If Ms. Lyons or her clients, the United Way of the Texas Gulf Coast, United Way of Texas Gulf Coast Cash Balance Plan, if they offered you–to pay you the $16,401 and some odd cents that you're asking for, if they offered to pay you that money today to end this lawsuit, would you take it?
> A.   No.
> Q.   And why not?
> A.   Because I want all the people that are in this class action suit to get their money, too.
> Q.   Okay. And do you feel you have a duty to do that for them?
> A.   Yes, I do.
> Q.   As the class representative?
> A.   Yes, I do.

(*Id*. at 103:16-104:9.) The court finds, therefore, that Humphrey will adequately and appropriately protect the interests of the absent class members.

The court also finds that Humphrey's counsel is a zealous and competent representative. Plaintiff's counsel in charge, Eva Cantarella ("Cantarella"), and her law firm, Hertz, Schram & Saretsky, P.C. ("HS&S"), are very experienced ERISA class action litigators. *See Crosby*

---

[8] She and Blackmer had been friends for decades. He discussed the case with her and nominated her his beneficiary before he died of cancer. He described to her that the 89 Plan was the "A side" and the 96 Plan was the "B side" and that he was entitled to "A plus B."

*v. Bowater Inc.  Retirement Plan for Sararied Employees of Great Northern Paper, Inc.*, 212 F.R.D. 350, 353-54 (W.D. Mich.  2002) (noting that HS&S is "nationally recognized for its plaintiff representation in ERISA and employee benefit cases" and finding its lawyers "to be a very experienced and capable advocates for the class"), *rev'd on other grounds*, 382 F.3d 587 (6th Cir. 2004), *cert denied*, 544 U.S. 976 (2005).  Cantarella, a partner at HS&S, has participated in ten pension plan class actions and has also successfully prosecuted non-class claims for ERISA benefits, including pension benefits. (*See* Cantarella Aff. ¶¶ 10-14, Doc. 44 Ex. D.)  The other attorneys working on Humphrey's behalf are equally experienced and capable.  (*See* Bradley Schram Aff., Doc.  44 Ex.  B; Robert Geller Aff., Doc.  44, Ex.  C.)  Together they have relentlessly advocated on behalf of Humphrey and the putative class members.  This effort is typified by the extensive and detailed briefing provided not only in this motion for class certification but also on Plaintiff's cross motion for summary judgment.  (*See generally* Docs. 41-55, 59, 64, 68, & 84.)  Moreover, Cantarella presented her case at the hearing on class certification in a cogent and prepared manner. For these reasons, the court finds that Plaintiff's counsel and her firm are more than adequate to represent the class action.

      In conclusion, the court holds that all four of the Rule 23 prerequisites are satisfied in this case.  There are numerous 96 Plan participants that are all equally affected by one central legal issue, whether the "plus" methodology should have been used to calculate these pensions. Humphrey understands and appropriately controls the litigation, and her attorneys work tirelessly on her behalf.  Having determined that the prerequisites of Rule 23 are met, the next inquiry is whether certification is appropriate under Rule 23(b).

      (B)     <u>Certification under Rule 23(b)</u>

      Plaintiff moves for certification under Rule 23(b)(1)(A), (b)(2), and (b)(3). The Fifth Circuit has observed that "[u]nder Rule 23, the different categories of class actions, with their

different requirements, represent a balance struck in each case between the need and efficiency of

a class action and the interests of class members to pursue their claims separately or not at all."

*Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 412 (5th Cir. 1998).   The panel in *Allison*

summarized,

> The (b)(1) class action encompasses cases in which the defendant is
> obliged to treat class members alike or where class members are
> making claims against a fund insufficient to satisfy all of the claims.
> . . . The (b)(2) class action, on the other hand, was intended to focus
> on cases where broad, class-wide injunctive or declaratory relief is
> necessary. . . . Finally, the (b)(3) class action was intended to dispose
> of all other classes in which a class action would be "convenient and
> desirable," including those involving large-scale, complex litigation
> for money damages.

*Id*.  The procedural safeguards provided under (b)(3), i.e., the absolute right to notice and right to

opt out of the class, are not automatically available to class members of a (b)(1) or (b)(2) class

action. The lack of automatic procedural protections reflects that the (b)(1) and (b)(2) classes are

more cohesive and homogenous, while the remedies sought by a (b)(3) class are often related to

disparate merits of individual claims of members with divergent interests. *See id*. at 413.  Humphrey

need only satisfy one subdivision to succeed on her motion for class certification.  *See Langbecker*,

476 F.3d at 306-07 (citing *Stirman*, 280 F.3d at 558-59).

> 1.      The court finds that class certification is most appropriate under Rule
>         23(b)(2).

A class can be certified under Rule 23(b)(2) if "the party opposing the class has acted

or refused to act on grounds generally applicable to the class, thereby making appropriate final

injunctive relief or corresponding declaratory relief with respect to the class as a whole. " Fed. R.

Civ. P. 23(b)(2).  Monetary relief is available in a Rule 23(b)(2) class action, but such relief must

not "predominate" the injunction or declaratory relief requested.  Monetary relief predominates in

Rule 23(b)(2) class actions unless it is incidental to requested injunctive or declaratory relief.

*Allison*, 151 F.3d at 415.  Incidental relief encompasses "damages that flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief."  *Id*. Such incidental damages should ideally be "only those in which class members automatically would be entitled once liability to the class (or subclass) as a whole is established" and "should at least be capable of computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances."  *Id*.   Additional hearings to resolve the disparate merits of each individual's case should not be required.  *Id*.  Nor should liability for incidental damages "introduce new and substantial legal or factual issues . . . [or] entail complex individualized determinations."  *Id*.  Incidental damages are, therefore, more "in the nature of a group remedy."  *Id*.  The determination of whether a given monetary remedy qualifies as incidental damages is not always precise, so the district court has the discretion to decide "whether a monetary remedy is sufficiently incidental to a claim of injunctive or declaratory relief to be appropriate in a (b)(2) class action."  *Id*. at 416.

Here, the court finds that the plan has acted on grounds applicable to the whole class and  that  monetary damages are incidental to the declaratory relief sought.  Humphrey requests a group remedy, the calculation of benefits according to the "plus" methodology.  Assuming liability is established, this remedy does not require individualized determinations of disparate claims, but can be calculated using objective criteria like length of service and age.   These objective criteria can be inputted into an actuarial calculation to determine the benefits owed.  As such, the amount automatically flows from a finding of liability to the class "as a whole" and is "not dependent in any significant way on the intangible, subjective differences of each class member's circumstances." *Allison*, 151 F.3d at 415; *see also Bratcher v.  Nat'l Standard Life Ins.  Co.  (In re Monumental Life Ins.  Co.)*, 365 F.3d 408, 419-20) (finding that insurance policy variables were "identifiable on a classwide basis and, when sorted, [were] capable of determining damages for individual

policyowners").  Like the variables in *Monumental Life*, the variables for the "plus" calculation are identical classwide and "[t]he prevalence of variables common to the class makes damage computation 'virtually a mechanical task.'"  *See Monumental Life*, 365 F.3d at 420 (citing *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 326-27 (5th Cir.1978) (quoting *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 68 (4th Cir.1977))).  Nor would money damages, as calculated using an objective formula, destroy the homogeneity or cohesiveness of this putative class.  All putative class members are harmed by the use of a "greater of" rather than a "plus" calculation of the minimum ERP benefit, as the sum of two pensions will always exceed the "greater of" either of such pensions, so all stand to benefit from a determination that the "plus" calculation is the legally correct interpretation of the 96 Plan.  Thus, none of the concerns expressed by the *Allison* panel are present in this case.

Defendants argue that Humphrey seeks neither injunctive nor declaratory relief because she brings suit "to recover benefits" under 29 U.S.C. 1132(a)(1)(B).  It is true that the monetary relief Humphrey seeks is not "equitable" in the context of 29 U.S.C. 1132(a)(3), which permits suit by ERISA fiduciaries only for traditional equitable relief.  *See Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209-10 (2002).  The relief is, however, declaratory.  Humphrey seeks a declaration that the plan's method of computing the early retirement benefits is unlawful.  *See Berger v. Xerox Corp. Ret. Income Guar. Plan*, 338 F.3d 755, 763 (7th Cir. 2003) (holding that a class was properly certified under Rule 23(b)(2) where the employees challenged the computation of their lump-sum pension benefits).  "That is a ground common to all the members of the class."  *Id.*  Damages flow mechanically from the potential declaration that the "greater of" computation was in error.  The court finds that the monetary relief is incidental to a finding of liability and that certification under Rule 23(b)(2) is appropriate.

In Rule 23(b)(2) class certifications, a court also has the discretion to order that notice of the action be sent to the class and that the class members be afforded the opportunity to opt-out.

*See* Fed. R. Civ. P. 23(d)(2); *Monumental Life*, 365 F.3d at 416.  When an action seeks monetary damages under Rule 23(b)(2), due process requires that at a minimum notice be provided to the class. *Monumental Life*, 365 F.3d at 416-17.  The notice need not, however, "be 'equivalent to that required in (b)(3) actions.'" *Id*. at 417 (quoting *Johnson v. Gen. Motors Corp.*, 598 F.2d 432, 438 (5th Cir. 1979).  Moreover, mandatory opt-out rights are not required.  *Id*.  Although incidental to the declaratory relief sought, monetary relief is present in the current class action.  As such, the court concludes that notice to the class of the pending action is required.   This notice satisfies any lingering concerns about the due process rights of the individual class members.

> 2.      Alternatively, the court would certify the class under Rule 23(b)(1)(A).

A matter can be certified as a class action if "the prosecution of separate actions by or against individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A).  Here, the court finds that certification of the Humphrey class would prevent incompatible standards of conduct.  Individual suits might lead to conflicting orders on the interpretation of the 96 Plan and the resulting calculation of the ERP benefits.  Under this scenario, the plan would be administering the ERP benefits using the "greater of" calculation for some beneficiaries and the "plus" calculation for others.  This is precisely the type of incompatible conduct that Rule 23(b)(1)(A) aims to prevent. *See In re Citigroup Pension ERISA Litig.*, 241 F.R.D. 172, 179-80 (S.D.N.Y. 2006) (noting that Rule 23(b)(1) "speaks directly to ERISA suits" because of the statutory obligations under ERISA to treat all class members alike).

Defendants argue that no one other than Humphrey's counsel has even noticed a mistake in the Plan document and, consequently, individual suits are unlikely.  (*See* Defs.' Resp. 32, Doc. 62.)  In light of Defendants failure to send out notice regarding the various amendments of the

96 Plan, it is not surprising that Humphrey is the only beneficiary to have made such a challenge. Indeed, the fact that no other plaintiff has come forward only favors class certification.  *See In re Citigroup*, 241 F.R.D. at 180 (S.D.N.Y. 2006) (noting in the context of 23(b)(1)(A) "the fact that only a limited number of plaintiffs have come forward can weigh significantly in favor of class certification").

Defendants also argue that certification under (b)(1)(A) is not appropriate if the relief sought is primarily monetary.  S*ee Langbecker*, 476 F.3d at 299, 318 (advising a district court to "consider the extent to which the due process concerns inherent in *Allison* apply to a (b)(1)(A) class and whether a (b)(1)(A) class can be maintained if damages are the primary remedy sought;" acknowledging that "the resolution of these issues is still uncertain in the Fifth Circuit"); *see also Doiron v. Conseco Health Ins. Co.*, 240 F.R.D. 247, 254-55 (M.D. La. 2007).  Assuming *arguendo* that the relief sought is primarily monetary,[9] the court remains  persuaded that certification of this action under (b)(1)(A) is appropriate.  To hold that "broad declaratory or injunctive relief must be primarily sought before Rule 23(b)(1)(A) applies to avoid the risk of inconsistent adjudications," a court would be implementing "guidelines [that] coincide with those expressly called for in Rule 23(b)(2) class actions, thus rendering Rule 23(b)(1)(A) superfluous or redundant."  2 Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 4:5 (4th ed. 2002).  The more consistent interpretation of (b)(1)(A), therefore, is that it permits certification when monetary damages are sought.  In this case, the court finds that the risk of incompatible standards of conduct is sufficient to satisfy the requirements of this subdivision.  Moreover, the court finds the due process concerns expressed in *Allison*, should they apply, do not pose a bar to certification.  Where, as here, the interests of the class are perfectly aligned with the interest of the class representative, the procedural

---

[9] *But see* Part 1, *supra*.

protections of (b)(3) actions, such as mandatory notice and the opt-out procedures, become less critical.

A final issue raised by Defendants is whether the court can certify a class under (b)(1)(A) over the opposing party's objection. Some courts have found that Section (b)(1)(A) is for the benefit of the party opposing the certification, such that the party can waive its protections and effectively veto the class certification. *See, e.g., Corley v. Entergy Corp.*, 222 F.R.D. 316, 320 (E.D. Tex. 2004). Neither the text of Section 23(b)(1)(A) nor the accompanying Advisory Committee's Notes supports the creation of an express right to waive certification under this subdivision. This section does not exist only to benefit the non-class party: "clearly all litigants as well as the courts benefit from consistency in the adjudication of claims of individual class members." *Ingles v. City of New York*, No. 01 Civ. 8279, 2003 U.S. Dist. LEXIS 2453, at *21 (S.D.N.Y. Feb. 20, 2003). The court also finds persuasive Professor Newberg's arguments on the topic:

> [T]he Advisory Committee Notes to Rule 23 contain no support for the view that the party opposing the class is the exclusive beneficiary of subdivision (b)(1)(A). Certainly the needs of the judicial system to avoid inconsistent adjudications of a single controversy must be respected, despite the willingness of a litigant to assume this risk.

Newberg, *supra*, § 4:7.

Thus, should it hereafter be determined that certification under Rule 23(b)(2) is inappropriate, the court would still certify the class pursuant to Rule 23(b)(1)(A).[10]

    (C)    <u>Scrivener's Error, Exhaustion of Remedies and the Statute of Limitations</u>

---

[10] The court would also consider certifying the class under Rule 23(b)(3) because "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *See* Fed. R. Civ. P. 23(b)(3). In a situation where the class fits the requirements under Rule 23(b)(1), (b)(2), and (b)(3), however, the court notes that it is proper to certify the action under (b)(1) or (b)(2) rather than (b)(3), which "is designed for situations where class action treatment is not so clearly called for as in subdivisions (b)(1) and (b)(2) of Rule 23." *Van Gemert v. Boeing Co.*, 259 F. Supp. 125, 131 (S.D.N.Y. 1966); *see also* Newberg, *supra*, § 4:20.

Three positions underlie a myriad of Defendants' arguments in opposition to certification: (1) that the doctrine of scrivener's error is an applicable defense, making reliance on the "plus" language a necessary element of Humphrey's claim; (2) that Humphrey must show that the unnamed class members have exhausted their administrative remedies; and (3) that some of the putative class members may be barred by the statute of limitations.  Addressing each argument in turn, the court finds none meritorious.

1.      Scrivener's error is not an applicable defense.

United Way consistently maintains that the "plus" language in the 96 Plan is merely a mistake, a scrivener's error, and that the court should reform the ERISA plan accordingly. Scrivener's error, however, is a defense of mutual mistake.  *See Chase Manhattan Bank v. First Marion Bank*, 437 F.2d 1040, 1049-50 (5th Cir. 1971).  While the parties dispute whether the "plus" language is a mistake at all,[11] neither dispute that such a mistake would be deemed unilateral, not mutual.  Therefore, a traditional scrivener's error defense is not applicable in this case.

Defendants reluctantly concede that scrivener's error is a defense of mutual mistake, but  argue that the doctrine should be extended for policy reasons because it would be unduly harsh to uphold this "mistaken" language.  The court disagrees.  Reforming the plain language of an ERISA plan because of a unilateral mistake by the drafters undermines several core ERISA principles: first, ERISA contains strict requirements for maintaining and administering the *written* plan documents. *See* 29 U.S.C. § 1102(a)(1) (requiring that employee benefit plans be maintained pursuant to a written instrument); 29 U.S.C. § 1104 (requiring that an ERISA plan be administered in accordance with the written documents and instruments governing the plan); *see also Degan v. Ford Motor Co.*, 869 F.2d

---

[11] There is credible evidence that the plus methodology was not mistakenly included in the 96 Plan.  (*See, e.g.,* Letney Dep., dated Feb. 12, 2006, 106:21-108:25, Pl.'s Ex.  61, Doc. 52 (testifying that she, as the primary drafter, thought that the 96 Plan conformed to United Way's intentions regarding the Early Retirement Pension).)  Moreover, the many drafts preceding the final version of the 96 Plan all contained either "plus" terminology or the conceptual equivalent.

889, 895) (noting that the writing requirements were a clear part of Congressional intent to fashion a comprehensive system of federal law designed to strengthen and protect the interests of employees in their expected retirement benefits).  When, as here, the written plan document is unambiguous,[12] the court is bound by the plain meaning of its terms, and reformation based on the unilateral mistake of one party is not appropriate.  A second fundamental principle in the ERISA context is that drafting errors are strictly construed against the drafter of the plan document.    *See Hansen v.  Continental Ins.  Co.*, 940 F.2d 971, 982 (5th Cir. 1991).  In *Hansen*, the Fifth Circuit explained:

> Any burden of uncertainty created by careless or inaccurate drafting . . . must be placed on those who do the drafting, and who are most able to bear that burden, and not on the individual employee, who is powerless to affect the drafting of . . . the policy and ill equipped to bear the financial hardship that might result from a misleading or confusing document.

*Id*. (contruing drafting errors in a summary plan description against the drafter and in favor of the employee).  Considering these policies, an extension of the scrivener's error doctrine to allow a plan drafter to reform an unambiguous ERISA plan because of its own unilateral mistake is not appropriate. Without the application of scrivener's error, Humphrey's and the other putative class members 'reliance on the unambiguous terms of the 96 Plan is legally irrelevant.[13]

---

[12] From 1996 to 2002, Section 6.5 of the 96 Plan stated that "[n]otwithstanding any provision of the Plan to the contrary, any Participant who retires on or after the Effective Date shall be entitled to an Early Retirement Pension equal to at least the Pension amount derived from the formula in effect under the Prior Plan on December 31, 1995 [sic] for all years of Credited Service (as defined in the Prior Plan) prior thereto plus the pension earned under this Plan."  (96 Plan Incorporating 1st Am. to 96 Plan, Pl.'s Ex. 12, Doc. 46 (emphasis added).)

[13] In *Langbecker*, the court cited with approval the following quotation from *Nelson v. IPALCO Enters., Inc.*, 2003 U.S. Dist.  LEXIS 26392, at *11 (S.D. Ind.  Sept.  30, 2003) (unpubl.):

> Relief will depend on individualized calculations for each account.  As noted, individual claimants may present issues of causation and reliance, so that a classwide determination that Defendants violated ERISA's requirements would not necessarily lead to an award in favor of a particular claimant.

476 F.3d at 317.  Here there are no individual issues of reliance or causation and, as indicated in the Rule 23(b)(2) analysis above, monetary damages can be calculated by objective criteria.  Thus, the decision in *Langbecker* to reverse certification under Rule 23(b)(2) is distinguishable.  So too is this court's decision not to certify a class action under Rule 23(b)(2) for the plaintiffs' claim for breach of fiduciary duty on behalf of the Plan under ERISA.  *See In re Enron Corp.  Securities, Derivative and "ERISA" Litig.  (Tittle)*, 2006 U.S. Dist.  LEXIS 43145 (S.D. Tex.

2.      Exhaustion of remedies is not required.

The Fifth Circuit has not directly addressed whether unnamed class members must exhaust their administrative remedies in an ERISA class action.  The Seventh Circuit, however, recently confronted this exact issue and held that unnamed class members in an ERISA class action need not always exhaust their plan remedies to be included in the class.  *See In re Household Int'l Tax Reduction Plan*, 441 F.3d 500, 501 (7th Cir.  2006).  As Judge Posner explained:

> Even in a Title VII case, where the plaintiff, including the named plaintiff in a class action, must exhaust his administrative remedies before suing, the class members need not also do so if, as will usually be the case (for otherwise class treatment would be inappropriate), their claims are very similar to those of the named plaintiff. Such exhaustion *is* required in social security class action cases, but that is because of the wording of the exhaustion provision in the social security statute.  That wording has no counterpart in Title VII's exhaustion provision--and ERISA does not mention exhaustion at all.
>
> Exhaustion of nonjudicial remedies, whether administrative or, in an ERISA case, of the arbitral-like internal remedies prescribed by the ERISA plan, furthers the goals of minimizing the number of frivolous lawsuits, promoting non-adversarial dispute resolution, and decreasing the cost and time necessary for claim settlement . . . and enables the compilation of a complete record. These purposes determine how much exhaustion to require in a class action. If  the complaint or subsequent filings adequately identify the class members' claims and demonstrate that they are indeed very similar to those of the named plaintiff, the defendant knows what he is facing and can make efforts to settle the full array of claims. In such a case, requiring exhaustion by the individual class members would merely produce an avalanche of duplicative proceedings and accidental forfeitures, and so is not required.
>
> This is emphatically the case when dealing with class actions under ERISA, where, there being no statutory requirement of exhaustion, the district court has discretion to require no exhaustion by anyone.

---

June 7, 2006).  In *Tittle*, the court found that the relief sought was "wholly monetary . . . and not incidental to any other remedy."  *Id*.  at *71.  In the instant case, which does not deal with breach of fiduciary duty and restoration of money to the plan as a whole, the court concludes that the monetary relief is incidental to the legal interpretation of the 96 Plan.

*Id.* (internal citations and quotations omitted).  The court finds this reasoning persuasive and applicable to the present case.  Humphrey herself, through Blackmer, has exhausted her administrative remedies, and her claim that the "plus" language controls is identical to the claim of the unnamed class members.  Requiring exhaustion by these unnamed members would not promote any of the goals articulated by Judge Posner: it would not minimize the number of frivolous suits because the class's claim for the enforcement of the plain language of the 96 Plan is not frivolous; it would not promote non-adversarial resolution because the plan has always used the "greater of" methodology and is unlikely to change course because of administrative challenges; and it would not decrease the cost and amount of time necessary to decide these claims.  Indeed, requiring exhaustion would only increase these costs and likely create "an avalanche of duplicative proceedings and accidental forfeitures." *See id*.  Finally, further compilation of the record is unnecessary because this case turns solely on the legal interpretation of the plan document.  For these reasons, Humphrey is not required to show that the unnamed class members have exhausted their administrative remedies.

3.      The statute of limitations has not run on the putative class members.

Because ERISA does not set forth statute of limitations to govern actions to clarify rights to benefits under 29 U.S.C. § 1132(a)(1)(B), courts look to the state statute of limitations most analogous to the claim being advanced.  *Harris Methodist Fort Worth v. Sales Support Servs.*, 426 F.3d 330, 337 (5th Cir.  2005) (citing *Hogan v. Kraft Foods*, 969 F.2d 142, 145 (5th Cir. 1992)); *see also Hall v. Nat'l Gypsum Co.*, 105 F.3d 225, 230 (5th Cir. 1997).  The parties agree that the most analogous claim is a breach of contract claim with a four-year statute of limitations.  To determine the accrual date, the Fifth Circuit instructs that an ERISA cause of action accrues after a claim for benefits has been made and formally denied.  *Harris*, 426 F.3d at 337.  Here, the court has held that the unnamed class members need not make a formal demand because such demand would be futile.  The plan has always interpreted the 96 Plan as using a "greater of" calculation and will continue

doing so unless otherwise ordered.   Thus, the putative class members' claims for the "plus" calculation have yet to accrue.  Alternatively, the putative class members' claims accrued when the Defendants denied their claims in the current suit.  Under either scenario, the four-year statute of limitations has not run for the unnamed class members.  Defendants do not, therefore, have individual statute of limitations defenses applicable to the putative class members.  The statute of limitations does not bar class certification in this case.

To the extent Defendants use scrivener's error, exhaustion of remedies, and the statute of limitations as arguments against a finding of class certification, the court finds these arguments to be without merit.

## IV.        CONCLUSION

Accordingly, for the reasons indicated above, it is hereby

**ORDERED** that Plaintiff's motion for class certification (Doc. 44) is **GRANTED**. The following class is certified pursuant to Fed.  R.  Civ.  P.  23(a) and (b)(2):

> All Participants or Former Participants (as those terms are defined in the Plan), and beneficiaries of such Participants or Former Participants, who (1) as of 12/31/95, had accrued a pension under the Prior Plan (as defined in the Plan), (2) were or hereafter are eligible for an Early Retirement Pension under the Plan ("ERP"), and (3) either received an ERP or are eligible to receive an ERP or hereafter become eligible to receive an ERP.

It is further

**ORDERED** that Plaintiff Ann W.  Humphrey is appointed and shall serve as the representative of the class certified above.  It is further

**ORDERED** that Hertz, Schram & Saretsky, P.C. is appointed and shall serve as legal counsel for the class certified above.  It is further

**ORDERED** that Plaintiff shall submit a proposed notice that concisely and clearly states in plain, easily understood language: (1) the nature of the action; (2) the definition of the class

certified, (3) the class claims, issues, and defenses, and (4) the binding effect of a class judgment on

class members in Rule 23(c)(3).  This notice shall be submitted to the court within twenty (20) days

of entry of this order.

      **SIGNED** at Houston, Texas, this 14th day of August, 2007.


           MELINDA HARMON
        UNITED STATES DISTRICT JUDGE