IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ANN W. HUMPHREY, individually and on behalf of others similarly situated, | § § § § | |
| Plaintiff, | § § | |
| VS. | § § | CIVIL ACTION H-05-758 |
| UNITED WAY OF THE TEXAS GULF COAST, a Texas non-profit corporation, and UNITED WAY OF THE TEXAS GULF COAST CASH BALANCE PLAN, | § § § § § | |
| Defendants. | § § | |

## OPINION AND ORDER

Pending before the Court in the above referenced action are three interrelated disputes: (1) objections (#159) to Plaintiff/Class Representative Ann W. Humphrey's[1] proposed final judgment (#153)[2] filed by Defendants United Way of the Texas Gulf Coast and United Way of the Texas Gulf Coast Cash Balance Plan's (collectively, "United Way"); (2) United Way's objections (#167) to Plaintiff's first amended and second amended proposed final judgments[3] and (3) briefing on whether two sub-trusts should be

_____

[1] Plaintiff is the designated beneficiary of pension benefits payable under United Way's 96Plan to participant Frederick B. Blackmer ("Blackmer"), deceased.

[2] Humphrey has since filed a second amended proposed judgment (#165), which will also be discussed.

[3] Attached to #161 and #165, respectively.

created to hold (a) prospective future damages for Groups III and IV Class Members and (b) damages for Groups I and II until the monies can be disbursed, or if Defendants appeal the Court's Opinion and Order granting summary judgment for Humphrey (#125) and do not obtain a supersedeas bond or discretionary stay, that the monies be deposited in the Court's registry.

## Background

On August 14, 2007, the Court certified the following Class of early retirees from employment with United Way of the Texas Gulf Coast (#87; also available as *Humphrey v. United Way of the Texas Gulf Coast*, No. H-05-0758, 2007 WL 2330933 (S.D. Tex. Aug. 14, 2007)):

> All Participants or Former Participants (as those terms are defined in the Plan),[4] and beneficiaries of such

---

[4] Up until 1996 United Way maintained a traditional defined benefits pension plan (the "89 Plan" or "Prior Plan"). In 1996 United Way switched to a cash balance plan (the "96Plan"). Both plans allowed for an election by Participants of an Early Retirement Pension ("ERP"). The dispute in this case was how the ERP should be calculated for Participants, among whom was Frederick Blackmer, who had accrued benefits under both the Prior Plan and the 96Plan, but who received only the pension earned under the Prior Plan. Thus in this suit Humphrey seeks to recover the pension Blackmer earned under the 96Plan, arguing that he was entitled to both under the "plus" language in § 6.5 of the 96Plan. This Court concluded that under the unambiguous, express language of § 6.5 ("Notwithstanding any provision of the Plan to the contrary, any Participant who retires on or after the Effective Date shall be entitled to an Early Retirement Pension equal to at least the Pension amount derived from the formula in effect under the Prior Plan on December 31, 1995 for all years of Credited Service (as defined in the Prior Plan) prior thereto plus the pension under this plan."), a participant who is eligible for an ERP is entitled to (A) the pension the participant earned under the

Participants or Former Participants, who (1) as of
12/31/95, had accrued a pension under the Prior Plan (as
defined in the Plan), (2) were or hereafter are eligible
for an Early Retirement Pension under the Plan ("ERP"),
and (3) either received an ERP or are eligible to receive
an ERP or hereafter become eligible to receive an ERP.

On February 19, 2008, the Court issued an order (#123 at 6)

clarifying the Class Membership:

1.  Participants who have received an ERP are part of the
class.
2.  Participants who have received a deferred vested ERP
are part of the class.
3.  Active or former Participants who are currently
eligible or may become eligible to elect an ERP under
sections 5.3 [specifying the age and service criteria for
Early Retirement] or 6.7 [governs the Deferred Vested
Pension ("DVP") and permits Participants who separate
from service while eligible for DVP, only, to age into
eligibility for the ERP by electing to receive their
pension after satisfying the age requirement under § 5.3]
are part of the class.
4.  Active or former Participants who accrued benefits
under the two Plans but who are no longer eligible to
elect an ERP are not part of the class.
5.  Participants who have received either an NRP [Normal
Retirement Pension] or a LRP [Late Retirement Pension]
are not part of the class.

Thus under orders #87 and 123, the Court classified the Class

Members, i.e., Participants and Former Participants who earned a

pension under the Prior Plan and 96Plan and their beneficiaries,

into four groups:

(1) those who received an ERP ("Group I");

(2) those who received a DVP after satisfying the age

_____

Prior Plan as of 12/31/95 "plus" (B) the pension the participant
earned under the 96Plan.  #125 at 12-15.  United Way had argued
that Blackmer was entitled to the "greater" of the two.

requirements for Early Retirement under § 5.3 of the 96Plan ("Group II");

(3) those who are, or may in the future be, eligible, to receive an ERP under § 5.3 of the 96Plan ("Group III"); and

(4) those who are, or may in the future be, eligible to receive an ERP under § 6.7 of the 96Plan ("Group IV").

#165 at 2-3.

On March 28, 2008, the Court granted summary judgment in favor of Humphrey.  #125; also available, *Humphrey v. United Way of the Texas Gulf Coast*, 590 F. Supp. 837 (5th Cir. 2008).  In addition it declared

> that the ERP payable under the [96Plan] must be no less than (A) the pension earned under the Prior Plan as of December 31, 1995, which is the five-year certain and life annuity payable at age [65],[5] determined in accordance with the formula in effect under the Prior Plan as of December 31, 1995, and the Participant's pay and service through that date, "plus" (B) the pension earned under the [96Plan], determined using all Contribution Credits and Interest Credits allocated to the Class member's Account Balance, including the Interest Credits on the Class member's opening Account Balance (denoted in the [96Plan] as the Prior Plan Account), **or** (2) a lump sum that is the Actuarial Equivalent of this sum, as determined using the [96Plan's] actuarial assumptions (i.e., interest rate and mortality table) for determining the Actuarial Equivalent.

#125 at 18-19.  Finally the Court ordered Defendants "to compute the ERP payable to each Class member in accordance with the

---

[5] Humphrey explains that in the March 28, 2008, the age was stated to be 64, which was a typographical error; 65 is the correct age.  #165 n.1.  United Way has not disputed her statement.

foregoing declaration and, if the ERP has already been distributed, pay the Class Member the difference between that amount and the amount computed in accordance with the court's declaration, plus pre-judgment interest at a rate to be determined upon further briefing by the parties." *Id.* at 19.

On November 20, 2008 the Court awarded Plaintiff, as the prevailing party, $825,888 in attorneys' fees and reasonable and necessary costs in the amount of $57,677.11 under ERISA § 502(g). #148. The Court used Texas Finance Code Ann. §§ 304.103-04 (Vernon 2006)(pre-judgment interest rate is the same as the post-judgment interest rate, is computed as simple interest, and accrues on the earlier of (1) 180 days after the date the defendant receives written notice of a claim or (2) the date the suit is filed) for the prejudgment interest rate and the accrual date proposed by Defendants. Moreover it concluded, "The most applicable postjudgment interest rate in this case is the rate specified in Texas Finance Code § 304.003(c), which is currently set at five percent (5%)." #148 at 16. The Court determined that

> (1) Humphrey is entitled to prejudgment interest on Blackmer's individual claim at a rate of 5% simple interest beginning 180 days after United Way received notice of his claim to calculate his benefits under the "plus" methodology; (2) class members who have received an ERP are entitled to prejudgment interest at a rate of 5% simple interest beginning on March 9, 2005 (the date this suit was filed) through the date of final judgment; and (3) class members who have yet to elect an ERP are not entitled to any prejudgment interest because such interest would be one based on future damages, which is expressly prohibited under Tex. Fin. Code § 304.1045.

-5-

Moreover, prejudgment interest will only accrue as to actual damages awarded and not on attorney's fees.

#148 at 16-17.

### United Way's Objections (#159)

### to Humphrey's first Proposed Final Judgment

**1.  *The preliminary statements in the Proposed Judgment do not accurately paraphrase the Court's orders referenced in the judgment.***

United Way first objects that in pages 1-4 of Humphrey's first proposed judgment some of the preliminary statements paraphrasing the Court's orders in this litigation are not correct.  The only statement specifically identified by United Way is that "the Court endorsed the Texas prejudgment rate and accrual date proposed by the Defendants" in its Opinion and Order of November 20, 2008 (#148 at 16).[6]

The Court finds that the identified statement adequately describes the Court's decision to "award prejudgment interest according to the rules set forth under the Texas Finance Code" and

---

[6] In #148 at 16, the Court wrote,

Texas law provides an appropriate source of guidance for district courts setting the prejudgment interest rate in an ERISA case. . . .  The court declines to depart from Texas law on the issue of prejudgment interest. Plaintiff's "equitable model introduces individualized inquiries that are at odds with the class certification request.  As such the court will award prejudgment interest according to the rules set forth under the Texas Finance Code.

that it is not necessary to quote the passage from the order nor incorporate the order by reference.

Because United Way does not point out any other allegedly inaccurate statements, the Court finds its objection should be overruled.

**2.   *The damages calculation includes a double recovery of interest.***

After explaining how the damages were calculated from spreadsheets prepared by Humphrey's actuary for (a) Class members who received an ERP or a deferred vested ERP from January 1, 1996 to September 30, 2007, and (b) for Class Members who received an ERP or a deferred vested ERP from October 1, 2007 to December 1, 2008, United Way used the methodology rejected by this Court in consistently paying ERP or deferred vested ERP under the 96Plan to participants or former participants the "greater of" (not "plus") the following: (1) the participant's account balance under the 96Plan (1/1/96 Balance + Contribution credits + Interest Credits)[7] or (2) the participant's Prior Plan Accrued Benefit.[8]

United Way complains that in the proposed judgment the damages are calculated differently for participants who received ERP in the form of their account balance under the 96Plan, which was effective January 1, 1996, than for participants who received their ERP under

---

[7] As did a participant named Mary L. Kelly, used as an example.

[8] As was done in Participant Blackmer's case.

the Prior Plan Accrued Benefit, effective January 1, 1989 and amended by the 96Plan. For the former group, damages are calculated as follows: Prior Plan Accrued Benefit + Contribution Credits + Interest Credits - Amount of Lump Sum = Damages. For participants and former participants who received ERP or deferred vested ERP in the form of their Prior Plan Accrued Benefit, the formula for "plus" damages is as follows: Contribution Credits + Interest Credits = Damages. United Way claims that the amount of damages claimed under the "plus" damages formula constitutes an impermissible double recovery of interest. It suggests eliminating this double recovery of interest by subtracting the amount shown in the "Interests Credits" column on Exhibits A and A-1 (developed from a spreadsheet prepared by Humphrey's actuary and presented to Humphrey's counsel in accordance with the Court's order (# 123)) from the "Damages" column for each participant and former participant.

In response, Humphrey charges that Defendants are trying to re-litigate the issue of the methodology for calculating the ERP under the 96Plan, asserting the same double-interest argument that they made in their Supplemental Brief in support of their earlier motion for summary judgment, as well as for a "greater of" methodology and a "scrivener's error defense. The Court rejected all these arguments and upheld the "plus" methodology, which was expressly required by § 6.5 of the 96Plan. #125 at 13-16.

Moreover Humphrey maintains that the two methodologies are the same because under that used for Blackmer, Defendants did not include Blackmer's Prior Plan Accrued Benefit[9] as part of his total ERP, nor did they subtract that amount from the lump sum he received. Damages can be computed for all Class members who received a lump sum by using the same methodology that Defendants present for Mary Kelly, as is required under § 6.5 and § 6.8 (requiring Actuarial Equivalence for optional lump sums): Prior Plan Accrued Benefit present-valued as of pension commencement date (Exs. A and A-1, spreadsheets prepared by Humphrey's actuary and presented to Humphrey's counsel in accordance with the Court's order (# 123)), **plus** pension earned under 96Plan (i.e., all Contribution and Interest Credits, including Interest Credits on the opening account balance (columns I and J), **minus** lump sum paid (column K). Humphrey insists that she is not seeking double interest.

Humphrey further contends that because Defendants never raised the double interest argument in Humphrey's administrative proceedings, it may not be considered now. *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 394 (5th Cir. 1999), *quoting Vega v. Nat'l Life Ins. Servs.*, 188 F.3d 287, 299 (5th Cir. 1999)(*en banc*)("'A long line of Fifth Circuit cases stands for the proposition that, when assessing *factual questions*, the district court is constrained

_____

[9] The Prior Plan Accrued Benefit is the annuity commencing at age 65 accrued as of 12/31/95, the date when the Prior Plan ceased to exist.

to the evidence before the plan administrator.'").[10] Thus the Court cannot consider Defendants' request that it conduct a trial to see if they have proven a scrivener's error defense.

Regardless, the double interest challenge lacks merit, Humphrey contends. As demonstrated by a letter dated 6/10/04 from Debra King to Plaintiffs' attorney Eva Cantarella, Blackmer was 56.03 years old on 1/1/96 when his Prior Plan Accrued Benefit (the annuity commencing at age 65) was present-valued to calculate his opening account balance under the 96Plan. He was 64.1 when he received solely the lump-sum present-value of that same age-65 annuity eight years later on his pension commencement date of 2/01/04. The increase in present-value of Blackmer's Prior Plan Accrued Benefit was not because he received interest on it, but because there were eight fewer years of discounting. Defendants used the same $302.82/monthly age-65 annuity to calculate both the 1/1/96 present value and the 2/1/04 present value. Blackmer received no interest or other enhancement to his Prior Plan Accrued Benefit during the eight years he participated in the 96Plan; instead the Benefit was frozen at $302.82/month (the amount accrued as of 12/31/95), since the Prior Plan did not give Interest Credits and ceased to exist on 12/31/95.

---

[10] "The administrative record consists of the relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it." *Vega*, 188 F.3d at 300.

Even if one could construe the Interest Credits payable on the opening account balance under the 96Plan as "double interest" on the Prior Plan Accrued Benefit, that construction would be a function of the unambiguous terms of the 96Plan, and thus not a "double recovery," argues Humphrey.   Holding Defendants to the terms of the Plan which they or their agents drafted is not unfair. In addition, in their Answer and Amended Answer Defendants admitted the allegations in ¶¶ 26, 27, and 30 of the Complaint (that under the 96Plan, Interest Credits are earned on both the Participant's opening account balance and on the Contribution Credits).   The Prior Plan does not provide Interest Credits; thus all Interest Credits are earned under the 96Plan.

Humphrey emphasizes that (1) during the administrative proceedings, Defendants devalued Blackmer's Prior Plan Accrued Benefit to $287.71, not the $302.82 sum that all parties now agree was his Prior Plan Accrued Benefit; and (2) when Defendants paid Blackmer his ERP, they paid him the Actuarial Equivalent lump-sum present-value of his Prior Plan Accrued Benefit, in essence assigning a value of zero to the pension Blackmer earned under the 96 Plan.   They did not add to his Prior Plan pension even those Contribution Credits and Interest Credits that they conceded in the administrative proceeds that he had earned under the 96Plan.   Thus during the eight years that Blackmer participated in the 96Plan, he accrued no new benefits.  Because Article VI of the 96Plan requires

that Interest Credits be paid on the opening account balance (as Defendants admitted in their Answer and Amended Answer to the Complaint), and the Prior Plan does not provide for Interest Credits, the Court should reject Defendants' "outrageous" suggestion that the Court allow Contribution Credits to be included in their damages, but not all Interest Credits earned under the 96Plan.

As it has previously, the Court rejects United Way's argument and agrees with Plaintiff that there is no double recovery here. United Way's objection is overruled.

**3.   *Prejudgment interest for class members who did not start receiving ERP until after the lawsuit was filed should be calculated from the date they started receiving ERP.***

Although the Court's order (#148 at 16) states that Class members who have received an ERP are entitled to prejudgment interest "beginning on March 9, 2005" (the date this suit was filed), Humphrey states that she agrees with United Way's proposal that the interest be calculated from the date they started receiving their ERP as "the more reasonable approach and probably what the Court actually intended." Therefore Humphrey asked her actuary to recalculate the prejudgment interest for the fifty-nine people affected and submits an Amended Proposed Final Judgment attached to this Reply (#161) and Second Amended Final Judgment (#165), which corrected that date problem. The amended documents

-12-

also include damages information for three additional Group I and II Class member Defendants identified after the original proposed judgment was filed on 12/22/08, and they assume a February 1, 2009 Final Judgment date and calculate prejudgment interest to that date.

The Court concurs with the parties that for Class Members who received their ERP after the complaint was filed in this action the date that prejudgment interest should commence is the date their ERP was paid.  The date of the proposed second amended Final Judgment and the calculations will have to be updated to this time, however.

**4.** ***The damages calculations are excessive for Class Members who are receiving ERP in the form of an annuity.***

United Way, noting that twenty-four people listed in Exhibit A are receiving their ERP or deferred vested ERP as an annuity, argues these individuals are receiving excessive damages, which are reflected for each participant as a lump sum based on the estimated amount of ERP each will receive over his life, rather than the actual amount he would have received by the date of the judgment if he had been paid the form of a monthly annuity.[11]  In other words,

---

[11] United Way cites Sue Ward, the last person on Exhibit A, as an example.  She began receiving an ERP on September 1, 2007 in the amount of $174.41 per month.  By January 1, 2009 she would have received $2,964.97 of her ERP, yet Humphry's actuary calculated a number over ten times that amount in representing her damages as a lump sum based on the estimated amount of ERP that she will receive over her life.

Humphrey's actuary erroneously presumes that these twenty-four people will have already received the full amount of ERP by the time of the judgment.  This presumption inflates the amount of damages and the prejudgment interest to be received by these 24 annuity recipients.  Instead, urges United Way, Humphrey should calculate the damages and prejudgment interest to be awarded to them as of the time of the judgment, not as of the time they will ultimately receive the entire amount of their ERP or deferred vested ERP.

Humphrey answers that her actuary calculated the damages for these people based on data provided by United Way's actuaries.  She states that her actuary may have been misled by the title of "Plus Damages (annuity)" in Column M of the damages spreadsheet.  Her actuary believed the amounts in that column were monthly equivalents of the "plus" damages; now Defendants have revealed that the $174.41 for Sue Ward is the annuity she is receiving, not the annuity equivalent of the "plus" damages.  Thus if the amounts in column "M" are annuity amounts currently in pay status, Humphrey states she will need more information to clarify the data, but in the meantime she has recalculated and estimated the damages for the twenty-four in accordance with Defendants' objections.  She has submitted an amended proposed final judgment attached to her reply

-14-

(#161).[12]

**5.  *The final judgment should not contain an estimate of the amount of future damages that may or may not be payable to class members who have not yet elected to receive an ERP or a deferred vested ERP.***

United Way objects that the final judgment should not contain estimates of the amount of damages that may or may not be payable to Group III and IV Class Members who have yet to elect an ERP or a deferred vested ERP and may not, while others may become ineligible.

In response Humphrey explains that in the Plan's Form 5500 Annual Reports, United Way's actuaries reported to the IRS that the weighted average retirement age is 60.  Under 26 U.S.C. § 412(c)(3)(A)(i) and Actuarial Standard of Practice No. 35, the weighted average retirement assumption must be reasonable and "[take] into account the experience of the plan and reasonable expectations."  Humphrey argues that given the reliability of the retirement assumption in the Plan's Form 5500s, if Defendants provide the relevant demographic information Defendants' actuaries are in a position to determine the probability that each Group II and IV Class Member will commence his pension before age 65 when he will be ERP-eligible, the "rational economic decision."

_____

[12] Accordingly, the Court will subsequently address United Way's objections to it regarding the amended proposed judgment.

-15-

Furthermore, urges Humphrey, the current damages can easily be calculated as the difference between (1) the sum of the Prior Plan pension and the pension earned under the 96Plan to date, using all Contribution Credits and Interest Credits made on behalf of the Participant under the 96Plan, including Interest Credits on the Participant's opening account balance (Prior Plan Account), **or** the Actuarial Equivalent lump sum of these two amounts, and (2) the ERP calculated to date under Defendants' "greater of" methodology. Humphrey observes that Groups III and IV Class members would also be entitled to any additional damages accruing between now and their pension commencement date, although future damages, like the current damages, would not be paid until the pension commencement date.   Humphrey refers the Court and Defendants to her Amended Proposed Final Judgment, which states only the current damages for Groups III and IV Class members.

## United Way's Objections to
## Plaintiff's second amended Proposed Final Judgment

Many of the objections to the second amended proposed final judgment are redundant of those to the first proposed judgment, regarding which this Court has ruled.  For those to which Humphrey agreed to make changes, the Court examines United Way's new or reiterated objections.

The Court highlights the fact that it is apparent that many of the calculations challenged by Defendants are based on information

that Defendants provided to Plaintiff under court order or the absence of requested necessary information because Defendants failed to provide it.

**1.   The preliminary statements in the Second Amended Proposed Judgment do not accurately paraphrase the Court's orders reference in the judgment.**

United Way reiterates its objection to the first proposed judgment.  The Court has already overruled it as lacking merit.

**2.   The damages calculation for Groups I, II, III, and IV includes a double recovery of interest.**

United Way repeats its objection to the first proposed judgment that the "plus" formula results in an improper double recovery of interest for class members in Groups I and II.  The Court again overrules this objection.

United Way also complains that the second amended proposed final judgment, without evidentiary support, states that the current "aggregate additional benefit conferred upon Group III and IV class members" equaled $4,636,087.62 as of October 29, 2009. United Way again objects that the total amount of "plus damages" assumes that every class member in Groups III and IV will elect an ERP.  United Way charges that the aggregate benefit is "grossly overinflated and completely speculative," because (1) United Way has previously shown that over 50% of the class members who made a pension decision in 2007, 2008, and 2009 elected not to take an ERP

-17-

or deferred vested ERP, and (2) because the damages calculation Plaintiff uses involves an improper double recovery of interest. United Way claims that the double recovery of interest can be eliminated by subtracting the total amount in the "Interest Credits" column of Exhibits A and B from the "Plus" damages column. Should the Court decide that the final judgment contain an amount reflecting estimated "future damages for class members in Groups III and IV despite United Way's objection, it urges that this amount should eliminate the double recovery of interest.

Humphrey responds that while United Way has stated that over 50% of the participants who made a pension decision during these years received a pension other than an ERP or deferred vested ERP, United Way has not "shown" or provided evidence to substantiate that assertion.  Even if United Way could do so, the evidence would not prove that 50% *currently* in Groups III and IV would elect not to take an ERP or deferred vested ERP, or that their aggregate damages would be any less than the amount indicated in the proposed judgment. Furthermore, those Group III and IV Class members who made the decision before the date on which the original class action notices were mailed, February 29, 2008, would not have known about this class action or that, under this Court's ruling, they could receive an ERP if they did not commence their pensions too early or too late to remain ERP-eligible.   Moreover, after 62 notices were returned as undeliverable, on September 29, 2009 the

-18-

Court ordered Defendants to provide updated contact information
sought by Plaintiff and permitted Plaintiff to mail on November 13,
2009 a proposed supplemental notice to Group III and IV Class
members, along with the original notice to persons whose notice had
been returned as undeliverable, and for those about whom Humphrey
did not receive additional contact information from United Way
until October 29, 2009.  #162.  Thus the earliest date these class
members would have been apprised of the eligibility criteria for an
ERP so that they would not inadvertently commence their pension too
early or too late to receive an ERP would have been a few days
after that mailing.  Even then, 27 of the 29 supplemental notices
were returned as undeliverable.

Humphrey argues that those who actually received the class
action notices are likely to make the rational economic decision
and elect to begin their pension when they are ERP eligible, as
reflected by the numerous calls from Group III and IV Class members
received by Class counsel.  Moreover for those whose Prior Plan
accrued benefit exceeds the pension earned under the 96Plan (and
who, without the Court's rulings would receive only the Prior Plan
accrued benefit under Defendants' "greater of" methodology),
damages will grow because Interest Credits [and Contribution
Credits if those Credits are or have been reinstated[13]] continue to

---

[13] Humphrey believes the Contribution Credits were frozen a few
years ago, but does not have current information as to whether they
remain frozen.

increase their cash balance accounts. Humphrey suggests these increases could replace or exceed any damages lost by Group III and IV Class members who do choose to commence their pension before or after ERP-eligibility age. She therefore objects to United Way's assertion that the aggregate benefit amount in the second amended proposed judgment is "inflated" or speculative."

Furthermore to explain how the numbers in the proposed judgment were reached, Humphrey attaches a "Second Affidavit of [actuary] David R. Fleiss" to her reply (#168). Setting out his credentials, which the Court finds establish his expertise as an actuary, Fleiss confirms the accuracy of the amount stated ($4,636,087.62) for the aggregate damages of Group III and IV Class members as of October 29, 2009, which he calculated after determining the amount owed to each member as the difference between (a) the sum of the present value of the Prior Plan Accrued Benefit + Contribution Credits + Interest Credits earned under the 96Plan and (b) the amount of the lump sum actually paid to the member. He states that the amount for each member matches the amount of damages calculated by Defendants, as shown on the spreadsheets Defendants provided to Plaintiff's attorneys on October 29, 2009. The amount of damages for Group III and IV Class members is a present value as of October 29, 2009 and includes an interest discount to reflect the time value of money and a mortality discount to reflect the likelihood of death and

forfeiture of the ERP expected to be paid in the future.  He emphasizes that the interest and mortality discounts were calculated by Defendants.   The Court finds this approach a reasonable way to estimate damages, the precise amount of which cannot be determined until participants have made their elections.

**3.  *Prejudgment interest for class members in Groups I and II who did not start receiving ERP until after the lawsuit was filed should be calculated from the date they started receiving ERP*.**

United Way observes that the proposed judgment states a total damages amount for Groups I and II that includes prejudgment interest, which Plaintiff calculated for each member beginning on March 9, 2005.  United Way represents that approximately 70 of these Class members did not start receiving ERP or a deferred vested ERP until after March 1, 2005.  The Court previously held that prejudgment interest is expressly prohibited on future damages.  #148 at 17.  Therefore it would be improper to award prejudgment interest on the "plus" damages claims for these 70 class members for any time before they began receiving ERP or a deferred vested ERP; such interest should be calculated on the date that person commenced receiving an ERP or a deferred vested ERP.

As discussed, Humphrey corrected this problem in the current proposed final judgment.  Mr. Fleiss's affidavit states that, based again on data provided by Defendants, for Humphrey the date as of which the prejudgment interest was calculated for Group I and II

-21-

Class members was December 27, 2001[14]; for all other Group I and II Class members, it was March 9, 2005 or the date on which the lump sum payment was paid or date of benefit commencement, if applicable.

Therefore the Court finds United Way's objection to be moot.

**4.   *The damages calculations are excessive for class members who are receiving ERP in the form of an annuity.***

As it did regarding the first proposed judgment, United Way complains that the 26 class members in Groups I and II who are receiving their ERP or deferred vested ERP in the form of an annuity are improperly presumed to have received the full amount of ERP by the time of the judgment, thereby inflating the amount of damages and prejudgment interest to which they are entitled.  These damages calculations should be corrected to reflect the proper amount of damages, if any, to be awarded to each of these class members as of the time of the judgment, not the total amount they may receive over the entirety of the annuity payments.

These corrections also have been made by Plaintiff in the second amended proposed judgment.  Regarding the 26 Group I and II Class members receiving their ERP in the form of an annuity, Humphrey's actuary and affiant David Fleiss calculated the amount

---

[14] The date that is 180 days after June 29, 2001, the day United Way received notice of Blackmer's claim to have his pension calculated under the "plus" methodology, per the Court's order (#148 at 16).

of damages as the present value as of the later of March 9, 2005 or the date of benefit commencement of the monthly amount of damages expressed as an annuity.  Fleiss states that the monthly amounts of damages were calculated by Defendants and provided by them with other data required to make his own calculation.  Moreover, the amount of damages, being a present value, includes an *interest discount* to reflect the time value of money and a *mortality discount* to reflect the likelihood of death and forfeiture of the monthly amount of damages.  The present value was calculated using an interest rate of 5% and the unisex version of the 1983 Group Annuity Mortality table.  Defendants failed to provide any data about the form in which the members' monthly annuities are being paid, so Fleiss assumed that all had elected to receive their benefits in the form of a straight life annuity, payable until death, with no survivor benefit.  In addition, the amount of damages includes the annuity members' prejudgment interest (representing the present value of the monthly amount of damages payable before the date of judgment) and post-judgment damages (the present value of the month amount of damages payable after that date).

Humphrey reiterates her previous objection that Defendants are trying to re-litigate the central issues in this case, the methodology for calculating the ERP under the 96Plan, asserting the same double-interest and scrivener's-error arguments that they made

in briefs relating to the summary judgment and which this Court rejected.  #57 at 25-39; #62 at 26-28; #63 at 4, 10-48; #66 at 1-4, 11-27; #69 at 7-20; and #125 at 18.  The Court agrees.

In light of Fleiss' affidavit and Humphrey's explanation of the way the calculations were made, the Court finds they are reasonable and that United Way's objection is moot.

**5.  *Any final judgment in this case should not contain an estimate of the amount of future damages that may or may not be payable to class members in Groups III and IV.***

United Way also insists Plaintiff should recalculate the prejudgment interest for these annuity recipients based on the amount of "plus" damages, if any, payable on those portions of the annuity payments made prior to the final judgment or the resulting amounts will improperly include prejudgment interest on future damages.

As noted, Humphrey has not presumed that the 26 Group I and II Class members receiving their ERP as annuity payments have already received the full amount of their ERP by the time of judgment. Instead the current proposed judgment reflects the discounted present value of their ERP, as calculated using an interest discount rate to reflect the time value of money and a mortality discount to reflect the probability of death and resulting forfeiture of the ERP.  Humphrey also states that because Defendants have not provided any details about the amount and date

-24-

of the annuity payments, Mr. Fleiss had to calculate prejudgment interest for these 26 Class members based on the ERP lump sum Defendants would have paid if they had elected a single sum.

Given the circumstances, the Court finds Humphrey's argument to be persuasive and overrules United Way's request for recalculation.

***6.   No sub-trust should be created to hold any damages awarded to Class Members in Groups I and II.***

***7.   No sub-trust should be created to hold the alleged "aggregate additional benefit" purportedly conferred upon Group III and IV class members.***

The Court examines these two objections together, just as the parties have briefed the sub-trusts issue.

United Way points out that the second amended Proposed Final Judgment requires United Way to establish a sub-trust within the existing trust for the Plan to hold the amount of money allocated to Class members in Groups I and II representing the total damages (damages plus prejudgment interest plus attorney's fees plus costs) which they have sustained until the monies can be disbursed and to provide an accounting to Plaintiff's attorneys at least every three months as to the funds in this sub-trust. Although Plaintiff agrees that Class members in Groups III and IV do not have damages payable at this point because they have not yet commenced their pensions, the proposed judgment contains a monetary amount

allegedly representing the "current aggregate additional benefit conferred upon Group III and IV class members" as of October 29, 2009.  It requires United Way to establish another, separate sub-trust within the Plan to hold this amount and to provide an accounting to Plaintiff's attorneys at least every three months regarding the funds in this sub-trust.

The parties dispute whether the two proposed sub-trusts should be created.

*Defendants' Brief (#163)*

Defendants' brief argues against creating a sub-trust to hold the monies due under the damages calculation for Groups III and IV for two reasons.

First, as it argued before, the calculation of the amount of damages for Groups III and IV is "inherently speculative" because the members of these groups have not elected to receive an ERP and may never do so.  Thus the number of class members is unknown. United Way reiterates that more than 50% of the class members in Groups III and IV who made a pension decision in 2007, 2008, and 2009, elected not to take an ERP or deferred investment ERP.  It argues that any calculation based on the incorrect assumption that 100% of the Class members in Groups III and IV will elect an ERP or deferred vested ERP will greatly inflate the amount of plan assets that would have to be removed from the plan and placed in the trust to fund their "future damages."  A Class member may elect to be

-26-

paid in the form of an annuity monthly over the course of his lifetime.  If he elects an ERP, the future damages would be the portion of pension benefits over and above this monthly amount that represents calculation of ERP under Humphrey's "plus" formulation. United Way asserts that if these "plus" damages are aggregated and calculated on a lump sum basis, the total amount would probably dwarf the amount that Class members would receive in annuity payments for any given month.  Because a substantial number of people in Groups III and IV are not eligible to elect an ERP, determining how many will elect an ERP is a wild guess. Calculating damages on a lump sum basis would require United Way to set aside and pay into a trust a lifetime lump sum amount of "future damages" for all Class members, including those who elect an annuity and are therefore not entitled to receive their pension in a lump sum.  The result would be to deplete unnecessarily existing Plan assets, as United Way would be forced to pay immediately into a trust tens or even hundreds of thousands of dollars in "future damages" on behalf of Class members who may not even be eligible to start receiving an ERP monthly annuity payment for another ten to fifteen years.[15]

---

[15] Warning of gross overinflation of the amount that would have to be set aside, United Way argues that applying the "plus" formula to calculate "future damages" would result in over $4.6 million being paid from the Plan if every Class member in Groups III and IV who is currently eligible for ERP or will be eligible in the future actually elects to receive his pension in the form of an ERP.  But if 50% never elect an ERP, as in the last two years, the putative

Second, creating a sub-trust to hold the monies that may or may not be payable to Group III and IV Class members will hurt them as well as all participants and former participants of the 96Plan. Class members in Groups III and IV will be harmed because the "future damages" will be immediately taxable once plan assets are removed and transferred to the trust because the new trust will not be a "qualified trust" under 26 U.S.C. §§ 401(a) that is exempt from tax under § 501(a). *See* discussion #163 at 6-8; *Hollingshead v. Burford Equipment Co.*, 809 F. Supp. 906, 918 (M.D. Ala. 1992)("If the plan is unqualified . . . [t]he employees must pay taxes on the benefits as soon as they become funded and vested, even if they have not yet received benefits."). Existing Plan participants will be harmed because the already underfunded liabilities of the Plan will be increased substantially by removal of existing Plan assets otherwise available for investment to satisfy liabilities, such as pension payments to participants and former participants.

United Way maintains that the Court does not have to create a trust to protect the rights of Class members in Groups III and IV. A final judgment in Humphrey's favor with a determination that some amount of "plus" damages must be paid at the time a participant

---

trust would be overfunded by over $2.3 million.  Thus if a trust were created to hold all potential "future damages" for Groups III and IV Class members, it is highly likely that the trust would end up holding millions of dollars that will never be paid to any Class member.

elects his or her pension will adequately protect that Class member.  That way Plan assets will remain in a qualified trust and participants and former participants will continue to receive tax benefits from taking eligible rollover distributions.  Furthermore Plan participants who are not members of Groups III and IV (composing over 86% of the Plan participants) will also be protected by having millions of dollars remain in the Plan and continued investment of those funds by the Plan's trustees to fund future pension obligations.

Instead, argues United Way, the Court must resolve certain preliminary issues before any final judgment can be entered in this action, including the following, some repeating United Way's objections to the first amended proposed judgment:  (1) whether Humphrey's damages calculation for Groups I and II includes an impermissible double recovery of interest ; (2) whether Humphrey's proposed damages calculations for Groups I and II are excessive for those class members who are receiving ERP in the form of an annuity; (3) whether prejudgment interest for class members in Groups I and II who did not start receiving ERP until after the lawsuit was filed should be calculated beginning on the date the lawsuit was filed or the date the Class members started receiving ERP; and (4) whether the total amount of damages for class members in Groups I and II should include lump sum amounts for persons who are receiving the pensions in the form of a monthly annuity.

United Way states that these same issues, except for the prejudgment interest question,[16] must also be answered for Class members in Groups III and IV.

United Way again objects that the damages calculation in Humphrey's proposed final judgment results in an improper double recovery of interest.   #159 at 8-10.  United Way also opposes Humphrey's use of a lump sum calculation to determine damages for persons receiving their pensions in the form of an annuity because that calculation improperly inflates the total amount of damages. #159 at 11-12.   United Way maintains that these problems will be aggravated if the same damages calculations are used for class members in Groups III and IV, as will be discussed.

*Humphrey's Brief (#164)*

Humphrey's brief supports establishing two sub-trusts *within* the trust for the United Way of Texas Gulf Coast Cash Balance Plan, as amended and restated effective January 1, 1996, which would hold damages separately (1) for Groups III and IV class members[17] and (2) for Group I and II class members until the monies can be disbursed,

---

[16] This Court has already ruled that prejudgment interest is prohibited on future damages.  #148 at 17.

[17] While United Way has argued that some of these Class members might become ineligible for ERP by waiting until they reach the age of 65 or later to commence their pensions, Humphrey responds, and the Court agrees, the probability of that occurring can be factored into the estimate by Defendants' actuaries and the probability is likely to be quite small as these actuaries' Form 5500 Annual Reports for the 96Plan represent that the "weighted average retirement age" is 60.

or, if Defendants appeal the summary judgment granted in favor of Humphrey and do not obtain a supersedeas bond or discretionary stay, that the funds be deposited into the Court registry until the appeal is resolved.  Fed. R. Civ. P. 62(d) and 67.  She maintains that these sub-trusts are appropriate because (1) the damages for Group III and IV can be readily ascertainable by the Court and the parties when they become payable; (2) quantifying the damages due to Group III and IV Class members will enable the Court to determine more readily, correctly, and fairly the amount of statutory attorneys' fees previously awarded that should be allocated to the Group III and IV future payees as opposed to Group I and II past payees; (3) quantifying the damages due to Group III and IV Class members will enable the Court to apportion more readily, accurately and fairly among all Class members any common-fund attorneys' fees that may be awarded; and (4)courts routinely require money damages to be deposited in the court registry where there is no supersedeas bond or discretionary stay of execution.[18]

Similarly, a sub-trust for Group I and II Class members is appropriate for three reasons.  First, it will enable the Court and the parties to determine at any time the amount of damages owed to these members, an amount that will change because (a) they accrue

_____

[18] Without a supersedeas bond or discretionary stay, depositing damages that become payable as Group III and IV Class members commence their ERP would be the only way to avoid execution on those damages.   A sub-trust would be less disruptive to the 96Plan's operations than transferring the funds into the registry.

prejudgment interest until a final judgment is entered and will accrue post-judgment interest thereafter and (b) when they commence receipt of their ERP or deferred vested ERP, they will become members of Groups I and II.  Second, this information will permit the Court at the appropriate time, e.g., settlement or resolution on appeal in Humphrey's favor, to apportion easily, accurately and fairly, between Groups I and II and Groups III and IV the statutory attorneys' fees awarded and any common fund fees that may be awarded to Class counsel.  Finally, if Defendants appeal the summary judgment for Humphrey and do not obtain a supersedeas bond of discretionary stay, they must deposit the damages for Group I and II into the Court's registry to avoid execution.

*Humphrey's Response (#165) to Defendants' Brief*

Humphrey answers that she does not seek to create a trust **outside** of the trust for the United Way of Texas of the Gulf Coast Cash Balance pln, but instead a judicially ordered one **within** the Plan's Trust, and thus all United Way's objections are irrelevant. The Court agrees that United Way has not focused upon this fact, which moots several of its objections.  Because the monies would still be within the Plan's trust, such a sub-trust would not impair the tax-qualified status of the funds in the Plan's Trust, but would continue to comport with the requirements of § 403 of ERISA and 401(a) of the Internal Revenue Code, which require plan assets to be held in trust by one or more trustees and for the exclusive

purposes of providing benefits to participants and their beneficiaries. 29 U.S.C. § 1103(a), (c); 26 U.S.C. § 401(a)(1), (2). The funds would not be taxable until they are actually distributed to the participant or beneficiary. Nor would there be any increase in underfunded liabilities of the Plan. The only circumstances that might be affected, i.e., loss of earnings on assets in the Plan's trust or determinations that additional benefits are currently owed to Groups I and II or will be payable in the future to Groups III and IV, would impact the Plan regardless of the creation of a sub-trust.

Humphrey maintains that after a final judgment issues, alternatively placing plan assets inside the Court's registry pursuant to court order also would not cause them to lose their tax-qualified status. *Crosby v. Bowater Incorporated Retirement Plan for Salaried Employees of Great Northern Paper, Inc.*, No. 1:01-cv-683 (W.D. Mich.),[19] the district court ordered the Class members' damages to be paid into the court's registry and "kept by the clerk in an interest bearing account . . . for later distribution pending resolution of defendants' appeal."

Humphrey notes, and the Court agrees, that the "preliminary"

---

[19] Humphrey reports that the Sixth Circuit reversed the district court's grant of summary judgment in favor of Crosby and the class solely on a procedural ground. Subsequently Humphrey's attorneys, who represented Crosby and the Class, re-filed the class action in the Northern District of Illinois, where it settled.

issues raised by Defendants are either irrelevant to the creation of a sub-trust within the Plan's trust or have already been decided by the Court in Humphrey's favor or have been resolved.

Defendants' objections about the damages being inherently speculative really address only the amount of Group III and IV damages that may be held in the trust, not whether they are uncertain. Humphrey asserts that the Supplemental Notice sent out to alert Group III and IV Class members that if they commence their pension after ERP-eligibility age (after 65), or before attaining ERP-eligibility age (age 55 with at least five years of service or at least age 50 with service totaling at least 65), they will no longer be members of the Class and lose the benefit of the Court's ruling that the ERP must be computed in accordance with the "plus" methodology, will likely increase the percentage of Class members in Groups III and IV who elect to receive an ERP of a deferred vested.[20]

*Defendants' Reply (#166) to Humphrey's Response*

United Way complains that Plaintiff fails to cite any legal authority authorizing a court to create a sub-trust when, as here, adequate relief is available to Groups III and IV under Section

---

[20] Humphrey suggests that damages will increase for those who remain in Groups III and IV whose Prior Plan accrued benefit exceeds the 96Plan as Interest Credits (and, if existing or reinstated, Contribution Credits) are added to their cash balance accounts. The increases will fully or partially offset, and may even exceed, any damages lost by Group III and IV Class members who commence their pensions before of after ERP-eligibility age.

502(a)(1)(B) of ERISA.   United Way observes that Plaintiff's complaint asserts claim under Sections 502(a)(1)(authorizing a plan participant or beneficiary to seek recovery of plan benefits) and 502(a)(3)(empowering plan participants, beneficiaries and fiduciaries to bring civil actions to enforce any provision of ERISA or the plan, to enjoin any practice which violates any provision of ERISA or the plan, and to obtain other "appropriate" relief to redress such violations) of ERISA.   Because adequate relief is available for Groups III and IV under Section 502(a)(1), to the extent that a court order creating a sub-trust can be characterized as "other appropriate equitable relief" under Section 502(a)(3), these Class members are not entitled to that relief. *King v. UNUM Life Ins. Co. of America*, 221 F. Supp. 2d 1, 3-4 (D. Me. 2002); *Constantine v. American Airlines Pension Ben. Plan*, 162 F. Supp. 2d 552, 557 (N.D. Tex. 2001).

Even if such a remedy is available, the administrative and procedural difficulties involved in creating a sub-trust far outweigh any benefits, insists United Way.   The existing Plan's trust holds assets available to pay the ERP of Groups III and IV who elect an ERP.   Establishing a sub-trust will impose unnecessary administrative legal costs and reports to the Internal Revenue Service and the Department of Labor, all at the expense of plan assets needed to pay participants and beneficiaries, which would thereby be reduced.   Transferring plan assets to the new sub-trust

-35-

will also result in investments of smaller amounts of assets, from which none of the participants and beneficiaries will gain because of increased administrative costs.   United Way reiterates its concern that the amount of plan assets that will need to be invested in the sub-trust is purely speculative.

United Way further contends that Plaintiff's argument that creating a sub-trust will be "less disruptive" to the Plan than posting a supersedeas bond after final judgment is entered "puts the cart before the horse" since there has been no final judgment and the Court has not yet decided to award "future damages" to Groups III and IV Class members.   Nor has the Court even considered a motion for discretionary stay of execution pending an appeal in this case.   United Way insists that the existing Plan trust provides the same assurance as would a sub-trust that the class members in Groups III and IV will be paid an ERP in the event they elect one.   As for Plaintiff's motivation in arguing for a sub-trust, i.e., a claim for common-fund attorney's fees, a request for common-fund attorneys' fees is still not before the Court.   *See Brytus v. Spang & Co.*, 203 F.3d 238, 247 (3d Cir. 247 (3d Cir. 2000)(denying a recovery of attorneys' fees under the common fund doctrine in a case that proceeded to judgment in favor of the statutory lodestar method to determine a fee to be paid by defendant); *Carraba v. Randalls Food Mkts., Inc.*, 191 F. Supp. 2d 815, 824 (N.D. Tex. 2002)(rejecting claim for attorney's fees under

-36-

the common fund doctrine, citing *Brytus*).

In sum, urges United Way, the Court should refuse to order creation of a sub-trust to hold any "future damages" that may or may not be recoverable by class members in Groups III and IV.

*Court's Determination*

Plaintiff's claim under ERISA is to recover benefits due under United Way's pension plans under Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)("to recover benefits due . . . under terms of [a] plan, to enforce . . . rights under the terms of the plan, or to clarify . . . rights to future benefits due . . . under the terms of the plan"). In *Varity Corp. v. Howe*, 516 U.S. 489 (1996), the Supreme Court held that Section 502(a)(3), 29 U.S.C. § 1132(a)(3), is limited to "appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy." *Id.* at 512. *See also Tolson v. Avondale Indus., Inc.*, 141 F.3d 604, 610(5th Cir. 1998)("Because [plaintiff] has adequate relief available for the alleged improper denial of benefits through his right to sue the Plans directly under section 1132(a)(1), relief through application of Section 1132(a)(3) would be inappropriate."). "When a beneficiary wants what was supposed to have been distributed under a plan, the appropriate remedy is a claim for denial of benefits under § 502(a)(1)(B) of ERISA rather than a fiduciary duty claim pursuant to § 502(a)(3)." *McCall v. Burlington Northern/Santa Fe Co.*, 237 F.3d 506, 512 (5th Cir. 2000),

-37-

*cert. denied*, 534 U.S. 822 (2001).  In *Variety*, the Supreme Court explained that § 1132(a)(3) is a "catchall" provision that provides relief for injuries not otherwise adequately remedied under ERISA. 516 U.S. at 515.  *See Musmeci v. Schwegmann Giant Super Markets, Inc.*, 332 F.3d 339, 349 n.5 (5th Cir. 2003)("Because we have found a remedy is available at law under Section 502(a)(1)(B), the Plaintiffs are foreclosed from equitable relief under Section 502(a)(3)."), *citing Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002).

The Court agrees with United Way that Humphrey's claim must fall under § 502(a)(1)(B) and therefore not include equitable relief.  The establishment of the subtrusts to hold any damages might violate this well established principle.  Even if it does not, the Court agrees with United Way that establishing the sub-trusts within the Plan would cause more problems than it would alleviate and that a final judgment stating that "plus" damages must be paid by the Plan when Group III and IV Class members elect their pensions is adequate protection.  The existing Plan trust is financially sufficient to satisfy any damages judgment for the Class.  To the advantage of all participants and beneficiaries, the Plan's trust, unsegregated, would be able to invest the Plan funds more effectively and efficiently without additional administrative costs and reporting burdens that would be added by the establishment of sub-trusts.  In *Varity Corp.*, 516 U.S. at 497, the

-38-

Supreme  Court noted,

> In some instances, trust law will offer only a starting
> point, after which courts must go on to ask whether, or
> to what extent, the language of the statute, its
> structure, or its purposes require departing from common
> law trust requirements.  And, in doing so, courts may
> have to take account of competing congressional purposes,
> such as Congress' desire to offer employees enhanced
> protection for their benefits, on the one hand, and on
> the other, its desire not to create a system that is so
> complex that administrative costs, or litigation
> expenses, unduly discourage employers from offering
> welfare benefit plans in the first place.

Moreover some key arguments from Humphrey are premature.  If
an appeal is taken, the Court will decide at that juncture whether
a supersedeas bond or discretionary stay is appropriate, or whether
funds should be deposited in the Court's registry.  Also too early
are concerns about an attorneys' fee award.   Accordingly, United
Way's objection to the subtrusts is sustained.

**8.   *United Way should not be required to provide an accounting to
Plaintiff's counsel for the amounts to be transferred into any sub-
trust the Court may order to be created.***

United Way, noting that Plaintiff has not explained why an
accounting is necessary, points out that the Plan is required by
the Department of Labor and the Internal Revenue Service annually
to account for the Plan assets and argues that mandating a separate
accounting for Plaintiff's counsel is an unnecessary administrative
cost that benefits no one.  Furthermore, Plaintiff provides no
legal authority for requiring an accounting in this suit.  An order

-39-

requiring an accounting is appropriate for a breach of fiduciary duty or a claim for relief under Section 502(a)(3) of ERISA. *See, e.g., Old Security Life Ins. Co. v. Continental Illinois Bank and Trust Co. of Chicago*, 740 F.2d 1384, 1397 (2d Cir. 1984)(breach of fiduciary duty); *Dunnigan v. Metropolitan Life Ins. Cool.*, 214 F.R.D. 125, 135 (S.D.N.Y. 2003)(Section 502(a)(3)). Plaintiff has not made a breach of fiduciary duty claim here. Furthermore, as argued above by United Way, because Plaintiff has asserted a claim on behalf of herself under Section 502(a)(1)(B), she is barred from seeking "other equitable relief" under Section 502(a)(3). *See, e.g., Constantine v. American Airlines Ben. Plan.*, 162 F. Supp. 2d 552, 557-58 (N.D. Tex. 2010). Section 502(a)(3) cannot support an order directing a sub-trust for class members in Groups I and II because those class members can obtain adequate relief under the Section 502(a)(1) claim for benefits. *Tolson v. Avondale Indus., Inc.*, 141 F.3d 604, 610 (5th Cir. 1998).[21] Class members in Groups III and IV can obtain adequate relief through a declaratory judgment for their Section 502(a)(1)(B) claim for clarification of

---

[21] Humphrey maintains that this case is inapposite because Humphrey has not brought a claim for breach of fiduciary duty. *Tolson* held that (1) the plaintiff's claim for breach of fiduciary duty under ERISA § 502(a)(3) was not distinguishable from his claim for improper denial of benefits under ERISA § 502(a)(1)(B); (2) under Supreme Court precedent one may not bring a claim for breach of ERISA fiduciary duty if there is an adequate remedy under ERISA § 502(a)(1)(B); and (3) since the plaintiff had an adequate remedy under § 502(a)(1)(B), his claim for breach of fiduciary duty was barred. 141 F.3d at 610.

their right to future benefits under the Plain.   #166 at 2-3.

Humphrey responds that she and the Court need periodic accountings for the sub-trusts to determine and verify readily who is in Groups I and II and who is in Groups III and IV and the amounts to be paid to each at the time their damages must be paid. As current Group III and IV Class members receive their ERP or deferred vested ERP, they will become members of Groups I and II. Thus the accounting is necessary and benefits the Class members even if the Court does not endorse creation of the subtrusts.   From telephone calls from Class members, counsel discovered several errors in Defendants' spreadsheets and notified Defendants about them.   Furthermore, while Defendants mention their accounting for the Department of Labor and Internal Revenue Service on a Form 5500 Annual Report, that Form has no provisions for identifying Class members or their damages or any information relevant to the calculation of their damages.

Any attendant costs are necessary, insists Humphrey.   She points out that United Way has failed to identify any such costs or shown them to be high.   Moreover, Defendants have already prepared a reasonably current accounting of the Class members' damages, as evidenced by their spreadsheets; keeping that up to date should be of minimal cost and difficulty.   Humphrey urges the Court not to delete them or the provisions requiring creation of the two sub-trusts from the final judgment.

Humphrey responds that despite Defendants' suggestion that
Humphrey must bring a claim for breach of fiduciary duty under
ERISA § 502(a) to obtain an accounting, the cases cited by United
Way do not have such a broad holding; Humphrey insists that she is
entitled to an accounting under ERISA § 105, which requires the
plan administrator to provide an accounting of a participant's or
beneficiary's benefits upon written request.   29 U.S.C. § 1025.
Humphrey notes that the Ninth Circuit among other federal courts of
appeals has recognized the propriety of requiring an accounting for
pension benefits due under the terms of the plan. *Yeseta v. Baima*,
837 F.2d 380 (9th Cir. 1988)(although there were also claims for
breach of fiduciary duty, the accounting was ordered only with
regard to plaintiff's claim to recover his vested pension benefits,
which could only have been brought under ERISA § 502(a)(1)(B)).
*See also Boone v. Leavenworth Anesthesia, Inc.*, 20 F.3d 1108, 1110-
11 (10th Cir. 1994)(affirming district court's conclusion that
plaintiff was entitled to an accounting of her pension and profit
sharing benefits under ERISA § 105); *Barrowclough v. Kidder,
Peabody & Co.*, 752 F.2d 923, 933-34 (3d Cir. 1985), *overruled on
other grounds, Pritzker v. Merrill Lynch Pierce Fenner & Smith*, 7
F.3d 1110, 1112 (3d Cir. 1993).   In particular § 1025(a)(1)(B)(II)
requires the administrator of a defined benefit plan to furnish an
accounting to a participant or beneficiary of the plan upon written
request.   Humphrey has made such a request on behalf of the Class

-42-

through her filings in this action.

The Court agrees with Humphrey that even without a claim for breach of fiduciary duty, a plan participant or beneficiary can obtain an accounting upon a written request.  Title 29 U.S.C. § § 1025(a) imposes a statutory duty upon an plan administrator to respond to a "written request of any participant or beneficiary" for a pension benefit statement; it is not a fiduciary duty involving discretionary authority, but a legal duty of the plan administrator involving a routine function not related to plan administration.  *Kujanek v. Houston Poly Bag I, Ltd.*, ___ F. Supp. 2d ____, No. H-09-0349, 2010 WL 3432230, *11 (S.D. Tex. Aug. 31, 2010), *citing Pegram v. Herdrich*, 530 U.S. 211, 225-26 (2000)(not all tasks of a plan administrator are fiduciary in nature).

An accounting will increase expenses.  Nevertheless from the history of this case, in which United Way has frequently delayed providing or not provided information even in the fact of a court ordered, the Court agrees with Humphrey an annual accounting would aid in insuring that class counsel received necessary information. In light of the other annual reports United Way must prepare, much of the information would be redundant.  The Court overrules United Way's objection.

**9.  Because recent case authority holds that a scrivener's error in plan documents may constitute a mutual mistake, a fact issue exists as to whether the Plan should be equitably reformed to state the**

***true intent of the parties.  Until this fact issue is resolved, it
would be inappropriate to enter any final judgment in this case.***

Previously this Court rejected United Way's defense of
scrivener's error because "[w]hile the parties dispute whether the
'plus' language is a mistake at all, neither disputes that such a
mistake would be deemed unilateral, not mutual."   #125 at 15.
Moreover, it noted that those courts which have considered the
defense in an ERISA context limited its application to situations
when the plan was the result of negotiation over a collective
bargaining agreement.  *See, e.g., Mathews v. Sears Pension Plan*,
144 F.3d 461, 465-67 (7th Cir. 1997).

The last statement is not accurate; the Court recognizes there
are a small number of cases, with differing views, which have
addressed the issue of reformation based on scrivener's error in an
ERISA context, without a collective bargaining agreement involved.

United Way cites a case, which has since been affirmed by the
Seventh Circuit, approving application of a scrivener's error
defense to an ERISA pension plan that did not involve a collective
bargaining agreement.[22]  *Young v. Verizon's Bell Atlantic Cash*

---

[22] In *Young*, the district court, observing that courts usually
resist permitting a party to avoid a contract obligation based on
a unilateral mistake, focused on the fact that in the ERISA
context, unlike one involving an employee collective bargaining
agreement, the pension plan is not negotiated by the parties, but
is unilaterally established and amended by the plan administrator.
 667 F. Supp. 2d at 896-97.  It concluded that "a drafting error by
an ERISA plan drafter is only a mutual mistake if the employees
were 'on notice' of the plan sponsor's actual intent." *Id.* at 897.

*Balance Plan*, 667 F. Supp. 2d 850 (N.D. Ill. 2009)(holding that an alleged drafting error by the attorney who drafted the plan can nevertheless be classified as a "mutual" mistake when both the plan sponsor and plan beneficiaries were operating under the same understanding of the sponsor's intent), *aff'd*, ____ F.3d ____, Nos. 09-3872 and 09-3965, 2010 WL 3122795 (7th Cir. Aug. 10, 2010). United Way points out that the plaintiffs in *Young*, like Humphrey, argued that the alleged drafting error by the attorney could not be a "mutual" mistake because the plan was unilaterally drafted by the plan sponsor.  The district court in *Young* rejected the argument; instead it held a trial on the issue of whether the plan should be equitably reformed to correct the scrivener's error and found that the testimony established that both the plan sponsor and the plan beneficiaries believed there was a drafting error that misrepresented the intent of the parties.  Furthermore, the *Young* court distinguished this Court's Memorandum Opinion in the instant case on the grounds that here "evidence was only offered as to the plan sponsor's intent and not the understanding of the plan beneficiaries."  667 F. Supp. 2d at 897.

United Way disagrees with the *Young* court about the evidence in this case and argues that the record here does contains evidence

---

It concluded that "where both the plan sponsor and plan beneficiaries were operating under the same understanding of the sponsor's intent, it is a 'mutual' mistake if the plan does not reflect that understanding."  *Id.*

that both United Way and the Plan participants believed ERP was to be paid on the "greater of" formula, not the "plus" formula advocated by Plaintiff.  Blackmer did not claim that he should be paid ERP in a manner other than the "greater of" calculation used by United Way, and the summary judgment record contains evidence that other participants thought the "greater of" formula was the one intended to be used to pay ERP.  #57, Ex. H at ¶ 9 (affidavit of Anna Babin, a plan participant who is currently eligible for a deferred vested ERP, Ex. B, l.9.).[23]  United Way maintains that this same record contains all the requisite elements to establish a scrivener's error defense:   (1) the Summary Plan Description

---

[23] Disagreeing with United Way's argument that a scrivener's error defense applies to the facts here, Humphrey objects that Defendants have not offered any proof that they ever informed any Class member that the ERP that was paid constituted only the pension earned under the Prior Plan or 96Plan, not the sum of these amounts.  Blackmer's pension estimates from United Way show only various pension amounts, not how they were calculated, and they expressly state that his pension is for his years of service from November 1968 until August 2003, i.e., for his years of service while in the Prior Plan before January 1, 1996 and his years of service while in the 96Plan since that day.  In addition, she highlights the fact that the SPD and other summary materials consistently represented that Participants would accrue additional benefits under the 96Plan.  In sum, the plan participants had no notice of how the plan was actually being administered.

United Way has cited the affidavit of Anna Babin, a member of the "Transition Team" that approved the cash balance design recommended by the Mercer actuarial firm;  Humphrey insists that the affidavit speaks only to Babin's own understanding of that design and does not state that Participants would receive only the "greater of" their Prior Plan pension or 96Plan pension.  Moreover, Humphrey maintains, United Way did not adopt the "greater of" language which was favored by actuary Mason of the Mercer actuarial firm that recommended the plan design.  See #41 at 45-46.

("SPD") is consistent with United Way's intent,[24] (2) there is an absence of any evidence that any plan beneficiaries actually relied on the language of the plan (in other words, the "plus" language), (3) the "course of dealing" between United Way and the Plan participants was payment of ERP on the "greater of" formula, and (4) Plaintiff's "plus" interpretation would create a windfall to Plaintiff and the class.   United Way insists that because the parties disagree whether these facts are sufficient evidence for the Court equitably to reform the Plan, the matter cannot be resolved on summary judgment.   Moreover, United Way argues, the Court did not consider whether the other elements of the scrivener's error defense were met because it concluded that a plan drafting error could never be a mutual mistake.   #87 at 22-23. United Way urges this Court to follow the district court in *Young* and conduct a trial, with a limited number of witnesses testifying

---

[24] This Court ruled otherwise, especially noting that the SPD's last sentence, "'You will not lose any part of your accrued pension as of December 31, 1995 as a result of the change to the Cash Balance Plan,' . . . specifically guarantees that a participant will *not* lose *any* accrued pension because of the switch from the Prior Plan to the 96 Plan." *Humphrey*, 590 F. Supp. 2d at 845. Furthermore, "the legal rule giving precedence to the SPD when it conflicts with the plan is rooted in cases recognizing a plan participant's right to rely on the language in the SPD." *Id., citing Hansen v. Continental Ins. Co.,* 940 F.2d 971, 982 (5th Cir. 1991).   This Court also pointed out that Defendants' request that it "declare that plan participants have no right to rely on actual plan documents" is "contrary to ERISA's policy in providing strict disclosure regarding plan documents."   *Id.* at 846.   Finally, typically construction of the language in an SPD over language in a plan is done in favor of the plan's participant, not the drafter. *Id.*

-47-

about the drafting error and the parties' intent, to determine whether United Way's scrivener's error defense has been proven, and if so, whether the Court should equitably reform the Plan to conform to the true intent of the parties regarding the calculation and payment of ERP and deferred vested ERP under the Plan.

In sum United Way urges the Court not to sign Plaintiff's second amended proposed judgment.

In response, noting that this Court has already ruled that the scrivener's error defense is not applicable here because neither side argued that the mistake was mutual, Humphrey cites *Wentwood Woodside I, LP v. GMAC Comm. Mortgage Corp.*, 419 F.2d 310, 316 (5th Cir. 2005) to show that the Fifth Circuit allows equitable reformation of a contract only when a *mutual* mistake prevents the written instrument from reflecting a meeting of the minds.  She insists there can be no mutual mistake here because only Defendants, or their agents, drafted the 96Plan.

Because the Seventh Circuit has affirmed the district court in *Young* but reached its conclusion on some differences, this Court examines the controlling appellate opinion concluding that ERISA § 502(a)(3) "authorizes equitable reformation of a plan that is shown, by clear and convincing evidence, to contain a scrivener's error that does not reflect participants' reasonable expectations of benefits."   2010 WL 3122795 at *8.   The Seventh Circuit discussed two of it earlier cases: (1) *Matthews v. Sears Pension*

-48-

*Plan*, 144 F.3d 461, 466-67 (7th Cir. 1998)(putting "the parties'
reasonable expectations ahead of the literal text of an ERISA plan
[with a benefits formula more favorable to employees]" where "the
employer offered objective, extrinsic evidence . . . [that] the
summary plan documents and the parties' course of dealings were
consistent with the employer's reading of the plan"); and (2) *Grun
v. Pneumo Abex Corp.*, 163 F.3d 411, 420-21 (7th Cir. 1998)("refusing
to set aside unambiguous plan language based on an employer's claim
of 'mutual mistake' . . . because the employee relied on the
literal plan language to predict his right to severance
compensation"). 2010 WL 3122795 at *8. Pointing out that
"[t]hough complex in design, ERISA maintains the basic goal of
'protecting employees' justified expectations of receiving the
benefits their employees promise them,' . . . [i]t would thwart
this goal to enforce erroneous plan terms contrary to those
expectations, even if doing so would increase employees' benefits."
*Id.* The appellate court did

> acknowledge . . . that equitable reformation of an ERISA
> plan creates some tension with the "written instrument"
> requirement of 29 U.S.C. § 1102(a)(1), also known as the
> "plan documents rule," . . . [which] ensures that every
> employee may, on examining the plan documents, determine
> exactly what his rights and obligations are under the
> plan," . . . without complicated "enquiries into nice
> expressions of intent" behind plan language.

*Id.* at *9, *quoting Int'l Union v. Murata Erie N. Am., Inc.*, 980
F.2d 889, 907 (3d Cir. 1992), and *Kennedy v. Plan Adm'r for DuPont
Savings & Inv. Plan*, 129 S. Ct. 865, 875, 877 (2009). Nevertheless

the Seventh Circuit panel chose to "look beyond the plan document to extrinsic evidence to determine the parties' understanding of the plan." While the plan on its face did not have language that was ambiguous, the appellate court found the plan "involve[d] language that . . . still misstates particular participants' benefits" because the employer presented "enough objective, convincing evidence to show . . . a scrivener's error inconsistent with participants' expected benefits." *Id.* at *9.

The Court agrees with Humphrey that one reason why it would not be equitable to reform the plan now is that United Way has yet to plead scrivener's error as a counterclaim. Humphrey argues that any current attempt to file such a counterclaim now is barred by the statute of limitations, laches, and unclean hands. In their amended answer Defendants only asserted an affirmative defense of scrivener's error. Fed. R. Civ. P. 13 requires that they have filed any counterclaim with their answer, or at the very least, with their amended answer. They failed to do so even though they have been represented by two, large, national law firms, Baker Botts and Fulbright & Jaworski.

The Seventh Circuit's opinion in *Young* is neither controlling nor persuasive to this Court. The Fifth Circuit held that a court may reform a contract only where both parties are mistaken as to a material aspect of the contract. *See, e.g., Ramsey v. Colonial Life Ins. Co. of America*, 12 F.3d 472, 479-80 (5th Cir.

-50-

1994)[25](*citing Audio Fidelity Corp. v. Pension Ben. Guaranty Corp.*,
624 F.2d 513, 518 (4th Cir. 1980)(in interpreting an ERISA-governed
pension, "a court of equity can reform a contract to correct a
mistake. . . . But the mistake must be mutual" or, if unilateral,
must accompanied by fraud by the other contracting party)),
*abrogated on other grounds*, *Moody Nat'l Bank of Galveston v. GE
Life I Annuity Assurance Co.*, 383 F.3d 249, 251-53 & n.5 (5th Cir.
2004).   In *Audio Fidelity Corp.,* the Fourth Circuit applied
standard principles of contract law to the plan and found that
because "its terms are clear and unambiguous," under the parol
evidence rule "oral testimony is inadmissible to vary its
unambiguous written terms," 624 F.3d at 518.   Thus this Court
concludes that the Fifth Circuit would not follow the district
court in *Young*'s trial to take testimony as United Way asks this
Court to do here, where the Court has found the Plan's language is
clear and unambiguous and where there have been no allegations of
fraud.   *See also Cinelli v. Security Pacific Corp.*, 61 F.3d 1437
(9th Cir. 1995)(the contractual agreement is to be found only in the
plan documents;   where the written terms of the formal plan

---

[25] Humphrey cites *Geosouthern Energy Corp. v. Chesapeake
Operating, Inc.*, 274 F.3d 1017, 1021 (5th Cir. 2001), *cert. denied*,
537 U.S. 814 (2002) to show in the Fifth Circuit, to justify
reformation of any document for a scrivener's error, the party
seeking the reformation must show there was a prior agreement
between the parties regarding the terms of the instrument and
provide "clear and convincing" evidence that a mistake was made and
the instrument does not reflect the intent of the parties.

document are unambiguous and there is no windfall to either party justifying reformation for a scrivener's error,[26] "application of principles of mistake would be inconsistent with ERISA's strong preference for the written terms of the plan and the goal of ERISA to ensure that an employee's rights and obligations can be readily determined from the plan documents").

Humphrey maintains there was no, and the Court agrees there is no evidence of a, prior agreement between the parties regarding the terms of the 96Plan since only Defendants' agents drafted the plan. Furthermore, this Court previously found that there was "credible evidence" that the "plus" provision was not a mistake.  #125 at 15 n.7.  Exhibits supporting Humphrey's motion for summary judgment demonstrate that the "plus" provision appeared in every draft of the ERP formula for the 96Plan and survived four amendments to the 96Plan.  In addition Question and Answer forms distributed to participating Agency Directors and others distributed to Participants repeatedly stated that here would be new benefit accruals under the 96Plan.  In November 1996, Craig Mason, an actuary for the Prior Plan and for the 96Plan until 2000, wrote a letter to Sandy Dareing, a United Way pension benefits coordinator, that recommended that the "plus" provision be changed to "greater

---

[26] In *Int'l Union v. Murata Erie North Amer.*, 980 F.2d 889, 907 (3d Cir. 1994) the Third Circuit determined that the doctrine of scrivener's error to reform a plan would be applicable where the result of the language of the plan would be a windfall to one party that neither party could have expected.

of," but that recommendation was not followed.  Finally the drafter
of the 96Plan, Susan Letney, testified that she gave Prior Plan
actuary Craig Mason, the 96Plan attorney Neslage from Baker Botts,
and United Way several drafts of the 96Plan, but that they never
told her that the drafts conflicted with United Way's intent or
that the "plus" provision was a mistake; in fact Letney believed
that she had not made any mistakes in drafting § 6.5.  The Court
concludes that Defendants have not and cannot show by clear and
convincing evidence that the "plus" provision was a mistake.

Moreover the Fourth Circuit panel in *Audio Fidelity Corp.*
rejected the employer's argument that "its employees would be
unjustly enriched by receiving their equitable share of the fund's
assets" as foreclosed by *Rochester Corp. v. Rochester*, 450 F.2d
118, 121 (4th Cir. 1971)(Russell, J.):

> "By rendering service for the period required under the
> plan, the employee's rights to benefits under the plan
> are 'earned no less than the salary paid to him (the
> employee) each pay period' and are 'in the nature of
> delayed compensation for former years of faithful
> service.'   Whether the plan be contributory or non-
> contributory, the benefits, thus earned, are not
> gratuities."

624 F.2d at 518.

In a recent opinion, *Cross v. Bragg,* 319 Fed. Appx. 443, Nos.
07-1699, 2009 WL 2196887, **6-8 (4th Cir. July 24, 2009), the Fourth
Circuit examined three arguments put forth by the defendants
seeking equitable formation" of an ERISA plan:  (1) the actuary who
drafted the plan acknowledged inclusion of an erroneous formula in

it; (2) the plaintiffs did not rely on the erroneous formula; and
(3) the IRS agreed that the inclusion of the formula was a
scrivener's error. *Id.* at *6.  The appellate court concluded that
each of these grounds turned on a question of law and did not
support equitable reformation.  *Id.*  Emphasizing "'we have
recognized that a scrivener's error, like a mutual mistake, occurs
when the intention of the parties is identical at the time of the
transaction but the written agreement does not express that
intention because of that error, . . . a court acting in equity
[may reform] an agreement.'"  *Id., quoting Blackshear v. Reliance
Standard Life Ins. Co.,* 509 F.3d 634, 642 (4th Cir. 2007)(*quoting*
27 Samuel Williston & Richard A. Lord, *A Treatise on the Law of
Contracts* § 70.93 (4th ed. 2003).  The panel stressed, "[T]he power
to recognize and correct a scrivener's error in an ERISA plan rests
exclusively with the courts, and an 'administrator cannot simply
'reform' a plan to correct what it unilaterally perceives to be a
mistake or error contained in the plan's written terms."  *Id.,
citing id.*  Furthermore, it emphasized, "A primary purpose of ERISA
was to require that participants and beneficiaries be fully advised
of their rights under employee benefit plans.  *Id,* at *7, citing 29
U.S.C. § 1102()(1)(requiring benefit plans to be written); *id.* §
1021(a)(requiring the plan administrator to deliver the summary
plan description to participants); *id.* § 1022(a)(requiring summary
plan descriptions to be 'written in a manner calculated to be

understood by the average plan participant).  It further quoted the United States Supreme Court in *Curtiss-Wright Corp, v. Schoonejongen*, 514 U.S. 73, 83 (1995), expressing the plan documents rule embraced by this Court:  "'[A] written [benefit] plan is to be required in order that every employee may, *on examining the plan documents*, determine exactly what his rights and obligations are under the plan." *Id.* at *7.  The Fourth Circuit reiterated, "Thus, when the terms of an ERISA plan are clear and unambiguous, a federal court is obliged to apply it as written." *Id.*  Citing *Audio Fidelity*, 624 F.3d at 518, on which the Fifth Circuit relied in *Ramsey*, the Fourth Circuit opined that a party seeking reformation of a plan must show by clear and convincing evidence that the mistake was mutual, or if it was unilateral, it was accompanied by fraud.  *Id.* at *7, *citing Restatement (Second) of Contracts* § 155 (1979)(providing that reformation was only available "[w]here a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of both parties as to the contents or effect of the writing.").  To establish a mutual mistake, the party requesting a reformation must demonstrate that the parties to the contract intended to agree to terms that are different from those reflected in the writing.  *Id., citing Restatement (Second) of Contracts*, § 152 (1979)(if "mistake of both parties at the time a contract was made as to a basic assumption on which the contract

-55-

was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party, unless he bears the risk of the mistake."

United Way's plan language was clear and unambiguous, including its summary plan description, that the benefits of the two plans were to be added together. United Way has failed to show that the "plus" formula resulted from mutual mistake, but only from its own mistake. United Way has not shown that when the plan was drafted, both parties intended it to use the "greater of" formula. Indeed there has been no showing that Blackmer or any participants had any role in drafting the plan or that there was any agreement among the plan, the participants and the beneficiaries. Nor has there been an allegation of fraud, required for reformation of a contract due to unilateral mistake under *Cross*. Moreover, that United Way's attempt to rely on a course of dealing during which United Way paid only the "greater of" the two, when it failed to give the participants and beneficiaries the necessary notice and information to determine that they were not receiving what the plan promised, cannot support an equitable remedy of reformation. Indeed, there is clear and convincing evidence that United Way tried to amend the plan unilaterally several times without notice to the participants and beneficiaries.

Humphrey also contends that enforcing the "plus" provision would not result in a windfall. Unlike in *Young*, enforcing the

express "plus" language in § 6.5 does not increase the opening cash balance account or provide a windfall to any Class member; it simply permits ERP-eligible Participants to continue to accrue benefits after the conversion of the Prior Plan to the "cash balance" 96Plan.  She also disagrees with United Way's claim that the SPD is consistent with its alleged intent to use the "greater of" formula; she asserts, with examples, that the SPD is filled with statements that Participants will immediately begin accruing additional benefits under the new cash balance formula.[27]  If the Court granted Defendants' request for retroactive reformation of the plan, Class members would be stripped of benefit accruals for years, the opposite of a windfall, maintains Humphrey.  Where applied, the "greater of" methodology would eliminate ("wear away") any increase in the amount of money a participant still working for United Way earned on his accrued benefit under the Prior Plan since the conversion in January 1, 1996.  Not only does the 96Plan explicitly promise new accruals in its "plus" language, but, as the Court noted in #12 at 15 n.6, citing 29 C.F.R. § 2520.102-3(j)(1), ERISA regulations require United Way to disclose in the SPD any "wear away."  The Court agrees.  There is no "windfall" to the Class here where the unambiguous plan expressly language provided

---

[27] For example, Humphrey quotes, "The interest credit, described above, will be earned on your beginning account balance (present value of your accrued pension at December 31, 1995), as well as on your new accrued benefits under the Cash Balance Plan."

for the benefits that the Class members earned and are entitled to receive.  Indeed, the Class is of limited size and the damages are relatively restricted for so large an employer.

Humphrey also makes a persuasive argument that during the administrative proceedings, unlike in *Young*, the plan administrator did not claim that the "plus" standard established in § 6.5 was a mistake, but instead agreed that Blackmer's attorney had "correctly point[ed] out" that the pension Blackmer earned under the 96Plan must be "added to" the pension he earned under the Prior Plan. Initial Denial (PX35, Bates 143).  Therefore the Court should not consider the argument now.

Humphrey also argues that the law of the case doctrine should preclude this Court's re-litigating the issue.  The Court disagrees; the law of the case doctrine, "under which an issue of fact or law decided on appeal may not be reexamined either by the district court on remand or by the appellate court on a subsequent appeal," does not apply because there has been no appeal of the Court's determination barring a scrivener's error defense. *United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002).  The doctrine does not apply to bar a district court from reconsidering its own prior orders.  *Zarrow v. City of Wichita Falls, Texas*, 614 F.3d 161, 171 (5th Cir. 2010), *citing Christianson v. Colt Indus, Operating Corp.*, 486 U.S. 800, 817 (1988).  Furthermore, the doctrine "'directs a court's decision, it does not limit the

-58-

tribunal's power.'"  *Id., quoting Arizona v. California*, 460 U.S. 605, 618 (1983).  It is "a rule of convenience designed to prevent unnecessary reconsideration of previously decided issues," but it is a rule that "'yields to adequate reason.'"  *Id., citing Loumar, Inc. v. Smith*, 698 F.2d 759, 762 (5th Cir. 1983).  The doctrine also does not bar a grant of summary judgment after the court has previously denied one.  *Id.*  "An order denying summary judgment is interlocutory and leaves the trial court free to 'reconsider and reverse its decision for any reason it deems sufficient even in the absence of new evidence or an intervening change in or clarification of the substantive law.'"  *Id., quoting Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 185 (5th Cir. 1990), *abrogated on other grounds*, *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994).

In sum, argues Humphrey, given (1) United Way's affirmative statement during administrative proceedings that the pension earned under the 96Plan must be "added" to the pension earned under the Prior Plan, (2) the 96Plan's unambiguous language, (3) Defendants' representations in the summary materials to Participants that additional benefits would accrue under the 96Plan, (4) Defendants' adoption of the "plus" methodology in administrative proceedings, and (5) the limited damages payable at this time, there is no reason to find a scrivener's error, much less a windfall to the Class.  As noted, the Court agrees with these points.

For contract-based ERISA claims, Humphrey further correctly observes that the Fifth Circuit applies Texas' four-year statute of limitations for suits sounding in contract. *Hogan v. Kraft Foods*, 969 F.2d 142, 145 (5th Cir. 1992). The 96Plan itself states that, subject to ERISA, the Plan "shall be construed, regulated, and administered under the laws of the State of Texas." Texas courts have held that a claim for reformation of a written instrument must be brought within four years after the alleged drafting error was discovered or should have been discovered. *Tucker v. Atlantic Richfield Co.*, 787 S.W.2d 555, 558 (Tex. App. 1990)(citing Texas' residual limitations statute, Tex. Civ. Prac. & Rem. Code Ann. § 16.051). United Way filed its amended answer over five years ago and discovered the alleged scrivener's error in § 6.5 over nine years ago.[28] Thus Defendants are time-barred from amending again to plead such a counterclaim. Again the Court concurs with Humphrey.

The equitable defense of laches requires showing (1) an inexcusable delay in asserting a claim and (2) undue prejudice to the party against whom the claim is asserted. *Rogers v. City of San Antonio*, 392 F.3d 758, 773 (5th Cir. 2004), *cert. denied*, 545 U.S. 1129 (2005). Humphrey claims, for the same reasons why a

---

[28] According to the deposition testimony of Actuary James, Blackmer's administrative claim of 6/29/01 to have his ERP calculated in accordance with the "plus" provision in § 6.5 triggered United Way's amendment of the 96Plan in 2002 to change the "plus" formula to the "greater of" formula.

counterclaim is time-barred, that there is no excuse for Defendants' delay in asserting a counterclaim for reformation. If allowed to do so now, she argues that she would be unduly prejudiced, since substantial passage of time will have caused memories to fade and some testimony to be lost forever. Moreover Humphrey has spent many hours and significant actuarial fees litigating this case based on defenses asserted before this Court ruled on the cross motions for summary judgment, all of which would be increased by allowing Defendants to add a counterclaim now. Again the Court agrees.

Accordingly, for the reasons indicated above, the Court OVERRULES United Way's objections to the proposed judgments. Nevertheless it is clear that the figures in the last submitted judgment need to be updated and the entire document must be amended to accord with the rulings in this opinion. Accordingly, the Court

ORDERS that Plaintiff shall submit a proposed third amended judgment within twenty days of receipt of this order, which the Court will review and determine whether it satisfies the Court's rulings. United Way has already had substantial opportunities to make its objections.

**SIGNED** at Houston, Texas, this 15th day of November, 2010.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE